683 A.2d 808

Stephen Michael DOWNS

v.

ROMAN CATHOLIC ARCHBISHOP OF BALTIMORE, et al.

No. 1803, Sept. Term, 1995.

Court of Special Appeals of Maryland.

Sept. 25, 1996.

Reconsideration Denied Oct. 29, 1996.

John E. Harris, Sr. (Cheryl M. Brower, on the brief), Baltimore, for Appellant.

E. Scott Conover (Robert H. Bouse, Jr., on the brief), Baltimore, for Appellees.

Before WILNER, C.J., and HARRELL and JAMES S. GETTY (Retired, Specially Assigned), JJ.

WILNER, Chief Judge.

Appellant, a former candidate for priesthood in the Roman Catholic Church, filed a two-count complaint in the Circuit Court for Baltimore County against Archbishop William H. Keeler, four priests (Francis Murphy, John Wielebski, Paul Cook, and Michael Murphy), and the Roman Catholic Archbishop of Baltimore (the corporate body of the Church),

claiming that he had been defamed by them. The court dismissed the complaint on the ground that it raised ecclesiastical issues not within the subject matter jurisdiction of the court.

Appellant has appealed, framing five issues. We see the case as involving only two: (1) whether the court erred in concluding that appellant's claim raised ecclesiastical issues not within its subject matter jurisdiction; and (2) whether the court erred in denying leave to amend the complaint. We shall affirm.

## BACKGROUND

■ Because appellant's complaint was dismissed on motion, based on the pleading itself, we must accept all well-pleaded allegations of fact as true. Ambiguities and uncertainties in the pleading, however, are construed against appellant. *Faya v. Almaraz*, 329 Md. 435, 444, 620 A.2d 327 (1993).

Appellant entered the seminary in 1989. In the summer of 1990, the Archdiocese approved a continuation of his training in preparation for ordination to the priesthood. After serving at parishes in the Baltimore area, he was transferred, in October, 1992, to St. Patrick's parish in Cumberland. In 1993, he made a formal petition to be ordained and was assured by Archbishop Keeler that he would be ordained to the transitional diaconate in November, 1993, and to the priesthood in June, 1994. On August 20, 1993, however, he was informed by the Reverend James Barker that "he was released from the Archdiocese and, accordingly, would never be considered for diocesan priesthood." That decision, he alleged, was made after a meeting with Archbishop Keeler and Msgr. Francis Malooly.

Although no explanation for the Church's decision was given to appellant, he later learned from an individual who wishes to remain anonymous that the defendant Reverend John T. Wielebski, "made and published false and defamatory statements respecting the Plaintiff's honesty, reliability, integrity and morality, specifically, asserting sexually motivated conduct

toward certain staff members of St. Patrick's Parish in Cumberland, Maryland." Appellant further alleges that the other defendants repeated and republished "said defamatory allegations" with knowledge of their falsity and "with the intent to harm the Plaintiff's chances for ordination to the priesthood." Two elements of injury were alleged:

"14. As a result of these and other false and defamatory statements published by all Defendants named herein, the character and reputation of the Plaintiff were harmed, his standing and reputation within the Catholic Church and within the community were impaired, and he suffered mental anguish and personal humiliation.

15. As a direct and proximate result of the false and defamatory statements and memorandum published by the Defendants herein, the Plaintiff was not ordained to the position of priest within the Archdiocese of Baltimore, and, thereby, suffered a loss of prospective income which he would have earned from the salary associated with ordination to and the carrying out of priesthood responsibilities, and he was otherwise damaged and injured."

Although in Count I, appellant averred that the defendants repeated and published these statements with knowledge of their falsity, he did not allege that they had acted maliciously, and he sought only compensatory damages, in the amount of $500,000. In Count II, he alleged that they acted "maliciously, negligently and with a reckless disregard for the truth of the matters being asserted," and, presumably on that basis, he sought $1,750,000 in punitive damages.

The defendants moved to dismiss the complaint on the ground that it sought to challenge the process of training and selecting priests, which was an ecclesiastical matter immune from civil jurisdiction under the First Amendment. Appellant responded that the case was simply one of defamation and did not involve the internal ecclesiastical policies of the Church. He argued that he was not seeking review of any decision made by the Church, that he was not seeking reinstatement, and that his dismissal was but one element of damage. The

court accepted the defendants' argument. In a brief memorandum explaining its decision to grant the motion, it concluded that the statements attributed to the defendants were "certainly within the context of the 'formation process' of the priesthood," that the removal of unacceptable candidates for priesthood is purely an ecclesiastical function, and that the civil courts have "no business whatsoever in such affairs."

## DISCUSSION

### First Amendment Issue

■ Commencing in 1871 with *Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1871), and continuing through 1979 with *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), the Supreme Court has made clear that, under the First Amendment Establishment and Free Exercise clauses, civil courts have no authority to second-guess ecclesiastical decisions made by hierarchical church bodies. The most succinct expression of this doctrine appears in *Serbian Eastern Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 724–25, 96 S.Ct. 2372, 2387–88, 49 L.Ed.2d 151 (1976):

"In short, the First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them."

The Supreme Court cases have not, themselves, involved situations like that now before us—a suit for money damages based on a tort such as defamation—but rather have concerned, more directly, issues of church structure, governance, or property, including the selection of clergy. *See Watson v. Jones, supra, Gonzalez v. Roman Catholic Archbishop of Manila,* 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120

(1952); *Presbyterian Church v. Hull Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Maryland & Va. Churches v. Sharpsburg Church,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970); *Serbian Eastern Orthodox Diocese v. Milivojevich, supra,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151; *Jones v. Wolf, supra,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775. Nonetheless, the withdrawal of ecclesiastical controversies from civil jurisdiction has been a broad one. In *Watson,* the Court, in effect, declared immune from civil jurisdiction "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." 80 U.S. at 733, quoted favorably in *Serbian Eastern Orthodox Diocese, supra,* 426 U.S. at 714, 96 S.Ct. at 2382–83.

The goal of this exclusion is "to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones v. Wolf, supra,* 443 U.S. at 603, 99 S.Ct. at 3025. Even where the dispute actually presented to the court is one that, if presented by any other set of litigants, would clearly be justiciable, if the resolution of that dispute between the litigants at hand would require the court to adjudicate matters of church doctrine or governance, or to second-guess ecclesiastical decisions made by a church body created to make those decisions, the matter falls outside the court's authority. Only in the area of property disputes has the Court focused particularly on methods of allowing the civil courts to proceed, approving in *Jones v. Wolf, supra,* the "neutral principles of law" approach, *i.e.,* resolving the dispute in accordance with "neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded." *Id.* at 599, 99 S.Ct. at 3023, quoting from *Presbyterian Church v. Hull Church, supra,* 393 U.S. at 449, 89 S.Ct. at 606.

Although the Supreme Court has not dealt specifically with actions for defamation directed at churches or church officials, the lower Federal courts have. In most instances, as in this one, the alleged defamatory or other tortious conduct has been

intertwined with decisions regarding the plaintiff's fitness or suitability to act as a clergyman. In *Hutchison v. Thomas,* 789 F.2d 392 (6th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986), for example, an ordained minister sued his bishop and several other clergymen, contending that they had wrongfully brought about his early retirement. The complaint included actions for defamation and intentional infliction of emotional distress, based on the allegation that the defendants had "misrepresented his relationships at various churches, and through this misrepresentation brought about his enforced retirement."

Affirming an order dismissing the complaint for lack of subject matter jurisdiction, the Sixth Circuit Court of Appeals noted tersely, at 393:

"Appellant is really seeking civil court review of subjective judgments made by religious officials and bodies that he had become 'unappointable' due to recurring problems in his relationships with local congregations. This Court cannot constitutionally intervene in such a dispute."

A similar result was reached in *Yaggie v. Indiana–Kentucky Synod Lutheran Church,* 860 F.Supp. 1194 (W.D.Ky. 1994), *aff'd,* 64 F.3d 664 (1995). There, too, a pastor sued church authorities for defamation arising out of a decision to remove him from his ministry. Though acknowledging that none of the alleged defamatory statements themselves expressed any religious principles or beliefs, the Court nonetheless dismissed the complaint on First Amendment subject matter jurisdiction grounds. At 1198, the Court concluded that, not only was the interaction between a church and its pastor "an integral part of church government," but that "all matters touching this relationship are of ecclesiastical concern." Thus, it held, "[i]t makes no difference that the ecclesiastical dispute fails to touch on church or religious doctrine." *See also Farley v. Wisconsin Evangelical Lutheran Synod,* 821 F.Supp. 1286 (D.Minn.1993), dismissing a defamation action filed by a clergyman against his church where the offensive statements arose out of a controversy over the plaintiff's fitness to lead the congregation.

Similar results have been reached, on essentially the same basis, where other kinds of wrongful conduct have been alleged in connection with disputes between a clergyman and higher church authorities. *See Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360 (8th Cir.1991) (summary judgment for defendant properly granted in action by priest for unlawful age and sex discrimination arising from discharge as hospital chaplain); *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1358–60 (D.C.Cir.1990) (court lacked jurisdiction to resolve age discrimination claim); *Natal v. Christian & Missionary Alliance,* 878 F.2d 1575 (1st Cir.1989) (wrongful termination action by clergyman properly dismissed); *Rayburn v. General Conference of Seventh–day Adventists,* 772 F.2d 1164, 1167–71 (4th Cir.1985) (court lacked jurisdiction to review sex and racial discrimination claims by minister against church), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986); *Simpson v. Wells Lamont Corporation,* 494 F.2d 490 (5th Cir.1974) (summary judgment for defendant properly granted in action by pastor under Civil Rights laws based on his removal as pastor and eviction from parsonage).

We need not go as far as the *Yaggie* Court and hold that "all matters" touching the clergyman/church relationship are of ecclesiastical concern, immune from civil jurisdiction. The *Farley* Court recognized that situations might exist in which resolution of a defamation action against a religious organization would not require the court to undertake an inquiry violative of the First Amendment. 821 F.Supp. at 1290. *See also Drevlow v. Lutheran Church, Missouri Synod,* 991 F.2d 468 (8th Cir.1993). When the conduct complained of occurs in the context of, or is germane to, a dispute over the plaintiff's fitness or suitability to enter into or remain a part of the clergy, however, it is difficult to see how the forbidden inquiry could be avoided. Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church. As the Court observed in *McClure*

*v. Salvation Army,* 460 F.2d 553, 558–59 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972):

"The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." [1]

█ The allegations of the complaint before us demonstrate the correctness of the circuit court's conclusion. Appellant does not inform us of the exact language—the precise statement—made by any of the defendants. He says only that it asserted "sexually motivated conduct toward certain staff members of St. Patrick's Parish. . . ." We do not know what conduct was alleged or whether, if committed, it would have been unlawful. The statement—whatever it was—was made and repeated by the defendants "with the intent to harm the Plaintiff's chances for ordination to the priesthood."

Appellant does not indicate precisely what roles any of the four priests had in superintending his training or preparation for ordination, although it is certainly inferable that they had some role to play in that regard. The archbishop's responsibility for approving ordination is fairly clear.

It is apparent from these allegations, and the inferences that must necessarily be drawn from them, that the very heart of the action is a decision by appellant's clerical supervisors to prevent him from becoming a priest. The allegedly defamatory statements were made by them with that intent, thereby evidencing a determination on their part—whether valid and fair or invalid and unfair—that appellant was not a suitable candidate for the priesthood. That the offensive conduct was

---

1. *Compare E.E.O.C. v. Southwestern Baptist Theological Seminary,* 651 F.2d 277, 281–87 (5th Cir.1981) (finding First Amendment does not preclude application of Title VII to employment relationship between church and its non-ministerial employees). That was also the situation in *St. Luke's Church v. Smith,* 74 Md.App. 353, 537 A.2d 1196 (1988), *rev'd,* 318 Md. 337, 568 A.2d 35 (1990). We note, moreover, that the jurisdictional question was neither raised nor discussed in that case, which was decided, ultimately, on an issue of peremptory challenges.

so directed is what brings this case squarely within the protective ambit of the First Amendment.[2]

## Leave To Amend

■ At the conclusion of the hearing on the defendants' motion to dismiss, appellant asked the court for leave to amend the complaint "to include any additional facts." It is clear from the colloquy that what he wanted to add were further allegations concerning his injuries. He thought that the court was dismissing the complaint because it was directed solely at the injuries sustained by not becoming a priest, and he suggested that there was other injury as well.

We note initially that it is not at all clear that the court denied leave to amend. At one point, indeed, it told appellant, "If you put sufficient facts in the new complaint, we will have to rule on that at that time."

In any event, even if the court did effectively deny leave, we think that appellant misunderstood the basis for the dismissal and what would be necessary to survive another motion to dismiss. The complaint was not dismissed, as appellant seems to think, because he had failed to allege personal injury outside of his rejection for the priesthood. Paragraph 14 of the complaint speaks somewhat to that. As we have indicated, the problem for appellant is that the allegedly defamatory statements were made in the context of a conclusion by the Church hierarchy that appellant was not suitable to be a priest. The statements were made, he avers, to prevent him from becoming a priest. He did not suggest to the court that the complaint could be amended to indicate otherwise. An amendment simply to enhance the damage claims in ¶ 14 would have been of no benefit. For that reason, we do not believe that the court abused its discretion in denying leave to amend.

---

**2.** In light of this conclusion, we need not address whether, due to the vagueness of the alleged statement made or republished by the defendants, the complaint was subject to dismissal for failure to state a cause of action under State law requirements for pleading an action for defamation.

JUDGMENT AFFIRMED;  APPELLANT TO PAY THE COSTS.