838 A.2d 371

Hayden BOURNE et ux.,

v.

CENTER ON CHILDREN, INC., et al.

No. 2698, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 11, 2003.

David F. Albright (Albright & Goertemiller, LLC on the brief), Baltimore, for appellant.

Stephen S. McCloskey (Simms Showers, LLC on the brief), Baltimore, for appellee.

Argued before JAMES R. EYLER, ADKINS, PAUL E. ALPERT (Ret., specially assigned), JJ.

JAMES R. EYLER, Judge.

This case arises out of an employment dispute between Hayden Bourne, appellant, a former church pastor, and appellees, who are part of the Church of the Nazarene, an international Christian religious denomination (the Church). Hayden Bourne's spouse, Rhonda L. Bourne, is also an appellant.[1] Appellees are the Washington District Church of the Nazarene, Inc. (Washington District Church), which employed appellant; Center on Children, Inc., a non-profit day care center associated with the Church (Center on Children); and Donald Allison (Reverend Allison) and Kenneth Mills (Dr. Mills), Church leaders and appellant's former supervisors.

In October of 2001, following a disagreement with Church leaders, appellant filed suit in the Circuit Court for Baltimore City, claiming breach of employment contract, defamation, and false light. The circuit court entered summary judgment in favor of appellees, on the ground that the circuit court lacked subject matter jurisdiction to decide the case based on First Amendment religious freedom provisions.

On appeal, appellant argues that the circuit court erred because (1) the First Amendment does not bar litigation by or against a church on secular matters like contract and tort claims; (2) the appellees who are not churches are not protect-

---

1. In June, 2002, Rhonda L. Bourne was added to the suit as a plaintiff. At the same time, the complaint was amended to add a loss of consortium count. Because Rhonda L. Bourne was not involved in any of the events relevant to the issue on appeal, we shall, for ease of reference, use appellant in the singular to refer to Hayden Bourne.

ed by the First Amendment; and (3) summary judgment was not appropriate because there are material facts in dispute.

We hold that the circuit court correctly interpreted First Amendment jurisprudence in ruling that appellant's claims were barred for want of subject matter jurisdiction. Thus, we affirm the judgment of the circuit court.

## Background on Church Organization

Initially, it is helpful to understand the organization of the Church, so as to comprehend how each party became involved in this case. The Washington District Church is the regional supervisory body of the Church, overseeing the denomination's churches, ministers, and ministries within the region, including Baltimore. The Lighthouse Community Church (LCC), where appellant was employed during the time in question, is located within the Washington District's region.

The Center on Children is a non-profit organization established to form a ministry of daycare centers affiliated with the Church. Reverend Allison and Dr. Mills are both ordained ministers in the Church. Reverend Allison founded the Center on Children and served in numerous leadership roles with the Church, including president and CEO of the Center on Children and supervisory pastor at the Parkville Church of the Nazarene, where appellant briefly worked before he became pastor at the LCC. Additionally, Reverend Allison was appointed as a special liaison for the Washington District Church to handle matters associated with appellant once a problem arose. Dr. Mills served as the District Superintendent of the Washington District Church, overseeing all the churches and ministers within the district, including the LCC. Dr. Mills also served on the board of directors of the Center on Children.

## Factual Background[2]

Appellant is a citizen of Trinidad and Tobago, and he entered the United States in 1999 on a six month visitor's

---

**2.** Appellant's complaint, amended twice by interlineation, contained very few factual allegations. Appellant's brief summarizes the proce-

visa.[3] Prior to coming to the United States, appellant was a licensed minister at several Nazarene churches in Trinidad and Tobago. In March of 1999, appellant attended a revival hosted by the Church in Washington, D.C., where he expressed interest in becoming involved in an urban ministry in Baltimore. Thereafter, appellant accepted an offer to organize and form a Nazarene church in Baltimore City.

Appellant's mission to start a Baltimore City church was sponsored by the Parkville Church of the Nazarene (Parkville Church), located in Baltimore County and led by senior pastor Reverend Allison. Appellant began this mission by working as an assistant pastor at the Parkville Church.[4] As an assistant pastor, appellant spent the majority of his time in the Patterson Park Avenue area of Baltimore City, working to start a new church, which ultimately became the LCC. Reverend Allison acted as appellant's pastoral supervisor while he was with the Parkville Church.

Sometime after April of 2001, appellant ceased working at the Parkville Church and became the senior pastor of the

---

dural history of the case but contains no statement of background facts and contains no reference to the extract or the record other than to the complaint. Our statement of background facts is derived from appellee's brief, supplemented with information taken from the motion papers filed in circuit court.

3. Appellant filed an application to extend his stay, seeking a religious worker's visa, and was denied. Between 2000 and late 2002, appellant was "out of status" and illegally in the United States. Appellant had an application pending with the United States Immigration and Naturalization Service, filed in or about April 2002, but it is unclear whether this application was granted or denied. His present immigration status is unknown.

4. At some point during his brief employment at the Parkville Church, Reverend Allison offered appellant a written employment agreement. The job description required appellant to be faithful in attending church services, faithful in his commitment to the Church, faithful in tithes and offerings, and to "maintain a spirit of Christian cooperation with staff," and "maintain a spirit-filled relationship with the Lord." No written contract was ever signed between appellant and Parkville, or any other appellee.

LCC.[5] Prior to the founding of the LCC, the Center on Children purchased a number of buildings in the Patterson Park area and prepared them for use as a church and a daycare center. One of these buildings was designated for use as the LCC's pastor's residence. At some point after he became senior pastor, appellant moved into this residence, and lived there without paying for rent or utilities.

Appellant was a licensed minister with the Church, but he was not an "ordained" minister. Appellant applied for ordination in February of 2001. Ordination is ultimately determined by the General Board of the Church of the Nazarene, after receiving the local district's recommendation.[6] As part of the application process, the Washington District's Board of Credentials (Board of Credentials) interviewed appellant. Dr. Mills is a member of the Board of Credentials, but Reverend Allison is not. Initially, the Board of Credentials was in favor of recommending appellant for ordination.

In March or April of 2001, a member of the LCC complained to Reverend Allison concerning appellant's ministerial style. Reverend Allison discussed the complaint with Dr. Mills, who then advised the Board of Credentials of the complaint. Dr. Mills frequently received and dealt with such complaints, and he had the authority to investigate the matter. Choosing to do so informally, without the involvement of any board or church tribunal, Dr. Mills brought the matter to appellant's attention. Upon hearing about the complaint, appellant became upset. He was particularly displeased with Dr. Mills's refusal to identify who had lodged the complaint against him. Appellant believed that, under the manual of the Church, he had a right to confront his accuser. Dr. Mills felt such confrontation was inappropriate in a small congregation

---

5. This was mandated by the Church, as one is not permitted to be a pastor in more than one church.

6. The General Board of the Church of the Nazarene, the Church's governing national board in the United States, was originally a named defendant in this lawsuit. The circuit court granted the General Board's motion to dismiss for lack of personal jurisdiction.

and felt that the complaint in question was not significant enough to warrant such a confrontation.

Dr. Mills was not initially concerned about the complaint lodged against appellant, as it was typical of complaints he received regarding other pastors. He became concerned, however, as a result of appellant's reaction to the situation.[7] Thereafter, the Board of Credentials decided that it was in appellant's best interest to wait an additional year for ordination. During that year, the Board of Credentials recommended that appellant undergo counseling.

Appellant rejected this recommendation, and by September of 2001, appellant's relationship with Church leaders had significantly deteriorated. LCC's secretary resigned because of complaints about appellant's "dictator leadership." Dr. Mills declared the LCC "a church in crisis," meaning there was a moral, financial, or similar problem adversely affecting the ministry of the church.

On September 14, 2001, by letter, appellant was reassigned back to Trinidad, where he was a lawful citizen. Appellant declined this reassignment and stopped working for the Church altogether. He refused to vacate the pastor's residence, however, which was still owned by the Center for Children, despite not performing any ministry or other activities for the LCC.[8]

Appellant filed this lawsuit in the Circuit Court for Baltimore City in October of 2001 and filed two amendments by

---

**7.** Appellees allege that, following his meeting with Dr. Mills about this complaint, appellant became hostile and disobedient with regard to his Church supervisors. Moreover, appellant apparently had problems with Church supervisors in the past. His district license in Trinidad was not renewed once because of his "outspokenness," and failure to follow rules.

**8.** Appellant continued to refuse to vacate the premises, even after finding employment with another church in April of 2002. The Center on Children instituted a separate wrongful detainer action in the District Court for Baltimore City. At a hearing on October 11, 2002, the court ordered appellant to vacate the property within 30 days, which appellant eventually did.

interlineation soon thereafter. With regard to breach of contract, appellant claimed that appellees, individually and collectively, refused to honor their commitment to provide for his continued maintenance and support, in contravention of an alleged employment agreement. Specifically, the Center on Children agreed to provide appellant the necessary support to regularize his immigration status, in exchange for appellant raising funds for the Center on Children and moving into the Center on Children's property to renovate, repair, and provide security for the property. In an effort to force him to leave Baltimore, appellant claimed that appellees defamed him and published information about him that placed him in a false light. Specifically, appellant referenced a letter written by Reverend Allison on Center for Children stationary to various members of the Church containing defamatory statements concerning the status of appellant's paid vacation time.

Appellees thereafter filed a motion to dismiss on the ground that the court lacked subject matter jurisdiction due to, among other things, constitutional religious freedom provisions. That motion was initially denied because the court felt discovery was necessary to ascertain whether appellant's claims were purely secular.

On October 30, 2002, following the completion of discovery, appellees filed a motion for summary judgment, arguing, among other things, that discovery demonstrated clearly that appellant's claims "inescapably involve the court's exercise of subject matter jurisdiction over a religious matter and not a 'purely' secular matter." The circuit court agreed, and on December 30, 2002, entered an order for summary judgment in favor of appellees on all claims. Appellant subsequently filed a motion to amend or alter that judgment, which was denied.

A timely appeal was filed.

### Contentions of the Parties

Appellant contends that the circuit court erred in granting appellees' motion for summary judgment because his secular

contract and tort claims are not barred by First Amendment religious protections. Furthermore, because the Center for Children and the two individual appellees are not churches, appellant argues that they are not protected by the First Amendment. Finally, appellant states that summary judgment was inappropriate because some facts remain in dispute. He sets forth no facts, material or otherwise, however, to support this assertion.

Appellees respond that the circuit court correctly acknowledged that it lacked subject matter jurisdiction to entertain this lawsuit, as it necessarily involves the court's review of church doctrine, discretion, and procedure. As this case is unavoidably and inextricably intertwined with the administration and governance of a religious organization, appellees argue the First Amendment bars it from government review. Finally, appellees argue, because jurisdiction is precluded as to appellant's claims, appellant's wife's derivative suit for loss of consortium is likewise barred.

## Standard of Review

"[A]n appellate court's review of the grant of summary judgment involves the determination whether a dispute of material fact exists, and whether the trial court was legally correct." *Frederick Rd. Ltd. Pshp. v. Brown & Sturm*, 360 Md. 76, 93, 756 A.2d 963 (2000) (citations and internal quotations omitted); *see also* Md. Rule 2–501 (providing that a court shall enter summary judgment in favor of the moving party if "there is no genuine dispute as to any material fact" and "the party in whose favor judgment is entered is entitled to judgment as a matter of law."). We must review the facts, and the reasonable inferences that can be drawn from them, in the light most favorable to the non-moving party. *See, e.g., Di Grazia v. County Executive for Montgomery County*, 288 Md. 437, 445, 418 A.2d 1191 (1980).

## Discussion

Appellant argues that the circuit court erred in granting appellees' motion for summary judgment because the First

Amendment does not bar all litigation by or against a church. Specifically, when the issues are secular questions of contract and tort law, as in the instant case, appellant contends that the circuit court has subject matter jurisdiction. Moreover, because several appellees are not churches, appellant argues, they should not be protected by the First Amendment religious freedom provisions.

The test for determining whether a court has subject matter jurisdiction over a claim is "[i]f by that law which defines the authority of the court, a judicial body is given the power to render a judgment over that class of cases within which a particular one falls, then its action cannot be assailed for want of subject matter jurisdiction." *Engineering Mgmt. Servs. v. Md. State Highway Admin.*, 375 Md. 211, 242, 825 A.2d 966 (2003). In other words, "[s]ubject matter jurisdiction is the power to hear and determine a case." *Grindstaff v. State*, 57 Md.App. 412, 416, 470 A.2d 809 (1984) (internal quotations omitted). Thus, the instant case rests on a determination of whether the circuit court maintained the power to decide appellant's contract and tort claims, even if they were intertwined with appellees' right to First Amendment religious freedom.

The First Amendment to the United States Constitution provides, in pertinent part, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. The First Amendment religious clauses are applicable to the States by virtue of the Fourteenth Amendment to the United States Constitution. *See, e.g., Montrose Christian School Corp. v. Walsh*, 363 Md. 565, 585, 770 A.2d 111 (2001). Similarly, the Maryland Declaration of Rights contains a guarantee of the free exercise of religion. Md. Declaration of Rights, art. 36.

In interpreting the First Amendment freedom of religion provision, the United States Supreme Court noted that religious organizations require "an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church govern-

ment as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952). As a result, religious organizations must be allowed to select their own clergy, free from government interference. *Id.*

Similarly, this Court has recognized that the First Amendment provides religious institutions with significant freedoms with regard to matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Downs v. Roman Catholic Archbishop of Baltimore,* 111 Md.App. 616, 622, 683 A.2d 808 (1996) (quoting *Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 733, 20 L.Ed. 666 (1871)). The purpose of this exclusion is

> to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Even where the dispute actually presented to the court is one that, if presented by any other set of litigants, would clearly be justiciable, if the resolution of that dispute between the litigants at hand would require the court to adjudicate matters of church doctrine or governance, or to second-guess ecclesiastical decisions made by a church body created to make those decisions, the matter falls outside the court's authority.

*Downs,* 111 Md.App. at 622, 683 A.2d 808 (citations omitted). In *Downs,* this Court held that decisions regarding appointment and employment of a church minister must be left to the discretion of the religious organization, and it may not be second-guessed by a civil court. 111 Md.App. at 624–25, 683 A.2d 808.

Significantly, because religious organizations must be allowed to hire and fire their clergy members without government interference, numerous courts have carved out a "ministerial exception" to otherwise neutral employment discrimination laws, allowing religious institutions to select their clergy members without fear of reprisal from civil

courts.[9] This prohibition has grown to include employees whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship," or any position that is "important to the spiritual and pastoral mission" of the religious organization. *Rayburn v. Gen. Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1169 (4th Cir.1985). The Court of Appeals recently cited *Rayburn* with approval and noted that "the constitutional free exercise guarantee restricts governmental interference with a religious organization's hiring and firing of employees who are involved in the religious activities of the organization." *Montrose Christian School*, 363 Md. at 594, 770 A.2d 111.

With regard to appellant's claims, it is quite clear that as a pastor for the Church, appellant was a clergy member, whose primary duties consisted of teaching, spreading the faith, and participation in religious worship. Thus, the circuit

---

9. *See Gellington v. Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1304 (11th Cir.2000) (holding that the Religion Clauses of the First Amendment "prohibit a church from being sued under Title VII by its clergy" and "mandate[] that churches retain exclusive control over strictly ecclesiastical matters"); *Combs v. Cent. Texas Annual Conference of the United Methodist Church*, 173 F.3d 343, 350 (5th Cir.1999) (finding that a court cannot decide whether a ministerial employment decision was based on legitimate grounds without unconstitutionally interfering with the internal management of the church); *Bell v. Presbyterian Church*, 126 F.3d 328, 333 (4th Cir.1997) (stating that decisions about the "nature, extent, administration, and termination of a religious ministry [fall] within the ecclesiastical sphere that the First Amendment protects from civil court intervention"); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 470 (D.C.Cir.1996) (upholding the ministerial exception by dismissing a Title VII sex discrimination claim of a nun who was denied tenure); *Young v. N. Illinois Conference of United Methodist Church*, 21 F.3d 184, 187–88 (7th Cir.1994) (finding that religious organizations have the right, under the First Amendment, to make their own decisions regarding the employment of clergy members); *Scharon v. St. Luke's Episcopal Presbyterian Hosps.*, 929 F.2d 360, 363 (8th Cir.1991) (finding that a church-affiliated hospital has the right to choose its spiritual leader under the First Amendment); *Rayburn v. Gen. Conference of Seventh–Day Adventists*, 772 F.2d 1164, 1171 (4th Cir.1985) (holding that review of ministerial appointments would cause excessive state entanglement in religious decisions).

court lacked jurisdiction to interfere with the Washington District Church's decision to ordain or relocate appellant. *Downs,* 111 Md.App. at 624–25, 683 A.2d 808. *See Montrose Christian School,* 363 Md. at 593, 770 A.2d 111 ("church labor relations are internal affairs, and the state's interest in interfering to protect employees must be judged accordingly. The state may not intervene to protect employees from treatment that is merely arbitrary or unfair; the remedy for that is to resign or renegotiate the terms of employment.").[10]

Nevertheless, appellant argues, the circuit court should have reviewed his "purely secular" claims of breach of employment contract, defamation, and false light. In any event, according to appellant, First Amendment protections should not have been afforded to the Center for Children, Reverend Allison, and Dr. Mills because they are not churches. Appellant misses the point, however, because he fails to realize that consideration of his supposedly "secular" claims necessarily requires the court to delve into religious considerations.

With regard to appellant's breach of employment contract claim, appellant fails to set out any details of the contract allegedly violated by appellees. Appellant merely references a vague promise by the Center on Children to provide for the maintenance and support of appellant in exchange for his raising funds for the Center on Children and maintaining the property where he lived, which the Center on Children owned. No mention is ever made of a written employment contract with the Church or any of the other appellees.

Even assuming there was a contract, in evaluating the parties' adherence to such a contract, the court would have to make a determination regarding whether appellant met the qualifications to act as a minister for the Church. It appears that appellant's responsibilities included faithfully attending

---

**10.** For a discussion of *Montrose Christian School* and its implications on Maryland First Amendment jurisprudence, *see* Stephanie Kaye Baron, *A Missed Opportunity to Take a Clear Stance on the Constitutionality of Discriminatory Employment Practices by Religious Organizations,* 61 MD. L.REV. 869 (2002).

church services, committing to the church, giving tithes and offerings, and maintaining "a spirit of Christian cooperation with staff," and "a spirit-filled relationship with the Lord." In considering the issues raised by appellant, the court would have to consider whether appellant was properly performing his job. Doing so would mandate the court to consider appellant's adherence to religious tenants, his spiritual successfulness, as determined by the church, his teaching skills, and his relationship with both clergy and worshipers. Such determinations are clearly prohibited by the case law outlined above.

Moreover, even though some of appellant's duties are arguably "secular," his success as a clergy member of the Church would primarily be judged based on the religious tenets of the Church. In *Montrose Christian School*, the Court of Appeals specifically noted that all religious leaders perform both secular and religious duties as part of their jobs. 363 Md. at 594, 770 A.2d 111. Nevertheless, the Court stated that the primary responsibility of church employees is to carry out the mission of the church, and as such, the government is prevented from interfering with the church's employment decisions. *Id.* Similarly, although appellant presumably engaged in secular activities as a pastor for the Church, his primary duties were clearly religious and this Court, therefore, is prevented from reviewing his employment contract with the Church.

 With regard to appellant's tort claims, this Court has specifically noted that "[q]uestions of truth, falsity, [and] malice . . . often take on a different hue when examined in the light of religious precepts and procedures. . . ." *Downs*, 111 Md.App. at 624, 683 A.2d 808. When allegedly defamatory statements are made during the process of determining fitness for religious leadership positions, even if the statements are invalid and unfair, such speech is protected through the ambit of the First Amendment freedom of religion provisions. *Id.* at 625–26, 683 A.2d 808.

Appellant's tort claims of defamation and false light are based upon the same operative facts concerning his employ-

ment, his ordination, and his relocation. The only specific instance of defamation referenced in appellant's complaint involves a letter sent by Reverend Allison to various Church members regarding appellant's behavior as pastor of the LCC. Appellant claims that the defamatory statements were made in an effort to force him to leave town so the Church would not have to uphold its end of his employment contract. Even if Reverend Allison made defamatory statements in this letter and placed appellant in a false light, this Court may not consider the issue because it relates to appellant's employment with the Church. Clearly, any statements made by appellees with regard to appellant's performance as a minister are protected by the case law outlined above.

Finally, appellant cites no case law for his proposition that Center on Children, Reverend Allison, and Dr. Mills are not protected by the First Amendment. As appellees correctly note, "the inquiry as to whether subject matter exists . . . in light of the applicable federal and state constitutional religious provisions, does not depend on the identity of the party, but rather focuses on the facts of the lawsuit and whether the claims asserted are 'purely secular' or not."

The Center on Children is a non-profit organization associated with the Church. Appellant concedes that the Center on Children was established as part of the Church's effort to spread the Nazarene faith and raise revenue for the Church. As such, although it is a separate entity, the Center on Children was clearly established to evangelize and uphold the tenets of the Church's faith. Similarly, Reverend Allison and Dr. Mills, as Church leaders, are responsible for carrying out the mission of the Church.

The Supreme Court has held that a non-profit corporation associated with a church is entitled to the same protections as the church to which it is affiliated. *See Corporation of Presiding Bishop v. Amos,* 483 U.S. 327, 336, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987) (finding that a non-profit gymnasium associated with a religious organization was similarly exempt from Title VII of the Civil Rights Act prohibition against

employment discrimination). In *Amos*, the Supreme Court recognized that a religious organization as a whole "might understandably be concerned that a judge would not understand its religious tenets and sense of mission. Fear of potential liability might affect the way an organization carried out what it understood to be its religious mission." *Id.* As such, the Court acknowledged that the government had no place in interfering with the decision-making process of religions. *Id.*

 Following this rationale, it is clear that organizations closely associated with religious institutions, as well as employees of religious institutions, must be protected by the First Amendment in order to carry-out their religious mission without fear of reprisal from the government. A Church is nothing without the people and organizations who lead it and further its goals. Were we not to afford the same protections to church affiliated organizations and church leaders, the very purpose of the First Amendment would be frustrated. Consideration of appellant's claims against any of these parties would be akin to judging the actions of the Church itself, because they are responsible for carrying out the Church's mission. *See also Forest Hills Early Learning Center, Inc. v. Jackson*, 846 F.2d 260, 264 (4th Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989) (following *Amos*, and noting that "if an exemption is permissible in the context of employment practices in a gymnasium, one can only be more solidly justified where it acts to prevent state interference with church programs that provide education and care for children.")

The cases cited by appellant in his brief are irrelevant or distinguishable. While it is true that courts are permitted to review "purely secular" disputes involving religious organizations, the cases cited by appellant involve property disputes that do not require the court to review religious practices and procedures. *See Presbyterian Church of the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 449–50, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969)(pro-

viding that so long as the court does not delve into religious matters, a court can consider a property dispute involving a church); *Bey v. Moorish Science Temple of America, Inc.*, 130 Md.App. 543, 747 A.2d 241 (2000) (involving a religious organization and the construction of a trust, not associated with any religious tenet).

The circuit court was correct in its determination that it lacked subject matter jurisdiction over appellant's contract and tort claims. These claims, including appellants' derivative loss of consortium claim, were inextricably associated with the determination of religious issues by appellees, which are protected by the First Amendment. We, therefore, affirm.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT**