SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Shlomo Hyman v. Rosenbaum Yeshiva of North Jersey** (A-11-23) (087994)

**Argued March 26, 2024 -- Decided July 24, 2024**

**PER CURIAM**

The Court considers whether the "ministerial exception" grounded in the First Amendment to the United States Constitution -- which requires courts to "stay out of employment disputes involving" employees who hold "certain important positions with churches and other religious institutions," Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 745 (2020) -- bars the defamation claims asserted here by plaintiff Shlomo Hyman, a Judaic Studies teacher who was employed by defendant Rosenbaum Yeshiva of New Jersey, an Orthodox Jewish school.

Hyman was hired by the Yeshiva in 1988. According to the Head of School, in February 2019, the Yeshiva learned of "allegations of inappropriate conduct" by Hyman, "including allegations of intentional physical contact." The Yeshiva placed Hyman on administrative leave and retained a law firm to investigate the allegations. The law firm's findings included that former fifth and sixth grade female students had reported that Hyman "had intentionally touched them and other girls in his classes." The Head of School asserted that, after consultation with two respected rabbis, the Yeshiva deemed that Hyman's conduct was "not . . . acceptable or consistent with how a rebbe in our Yeshiva should interact with students" and that it "violated Orthodox Jewish standards of conduct" set forth in the staff handbook. In May 2019, the Yeshiva terminated Hyman's employment.

After further consultation, the Yeshiva sent a letter to the school community regarding the decision to terminate Hyman's employment. The Head of School e-mailed the Board of Directors, parents of current students, and faculty members stating in part that "it was determined that Rabbi Hyman's conduct had been neither acceptable nor consistent with how a rebbe in our Yeshiva should interact with students," and "the leadership of the Yeshiva has terminated his employment."

Plaintiffs allege that the letter was disseminated on social media, costing him employment opportunities and imposing financial, social, and emotional harm on him and his family. Plaintiffs filed this action in November 2019. As relevant here, Hyman individually asserted a claim for defamation. The trial court dismissed all of plaintiffs' claims with prejudice based in part on the ministerial exception.

1

Relying solely on the ministerial exception, the Appellate Division affirmed. 474 N.J. Super. 561, 572-83 (App. Div. 2023). With no reference to McKelvey v. Pierce, 173 N.J. 26 (2002), the Appellate Division held that "the ministerial exception applies to bar tort claims, provided (1) the injured party is a minister formerly employed by a religious institution and (2) the claims are related to the religious institution's employment decision." 474 N.J. Super. at 580. Noting that Hyman had conceded his status as a minister and that the defamation claims related to the Yeshiva's decision to terminate his employment, the court found that the ministerial exception barred those claims. Id. at 580-83.

The Court granted certification. 255 N.J. 419 (2023).

**HELD:** The six members of the Court who participated in this appeal unanimously agree that the standard set forth in in McKelvey, 173 N.J. at 51, applies in this case. The Court thus readopts that standard, with two refinements to accord with recent United States Supreme Court precedent, as set forth in Section III.C. of Justice Patterson's concurring opinion. See infra. at ___ (slip op. at 26-32). The members of the Court are equally divided as to whether discovery is required in this case. As a result, the judgment of the Appellate Division, which affirmed the trial court's dismissal of the case on summary judgment without discovery, is affirmed.

**JUSTICE PATTERSON, CONCURRING, joined by JUSTICES SOLOMON and FASCIALE,** reviews the United States Supreme Court cases in which the ministerial exception was developed and applied. Although that Court has not had occasion to apply the ministerial exception to a tort claim, the New Jersey Supreme Court has prescribed a standard to apply in determining whether a given claim is barred by the exception. See McKelvey, 173 N.J. at 32-33, 51-52. Under McKelvey, a court should individually assess each element of a claim and decide whether the court's determination of the claim would require it "to choose between competing religious visions, or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers." Id. at 51. If adjudication raises no such First Amendment concerns, the court may decide the claim; if not, it must dismiss it. Ibid. The Court does not adopt two aspects of the analysis in McKelvey that cannot be reconciled with the United States Supreme Court jurisprudence that followed: first, the ministerial exception is clearly not limited to employment decisions made by religious institutions on religious grounds; second, the Court does not adopt as part of its holding today the language suggesting that a minister's claim for damages in the employment discrimination setting does not implicate the First Amendment. Subject to those caveats, the Court reaffirms McKelvey's holding.

2

Applying the McKelvey standard, as modified, Justice Patterson concludes that adjudication of each element of Hyman's defamation claims would unconstitutionally interfere with the Yeshiva's authority to select and govern its ministers, and that the ministerial exception bars those claims. First, assessing the veracity of the message that the Yeshiva had deemed Hyman's conduct to be unacceptable is inextricably intertwined with the Jewish law that governs the Yeshiva's operations, in Justice Patterson's view, as is whether the e-mail was defamatory, which would necessarily entail an exploration of rules imposed by the Yeshiva addressing physical contact between teachers and students of the opposite gender. Justice Patterson explains that deciding the issue of unprivileged publication would implicate religious law with regard to both the contents of the letter and the scope of Rosenbaum Yeshiva's publication of the letter. Finally, Justice Patterson notes, to decide whether defendants acted negligently in drafting and sending the letter, a court would be compelled to decide whether defendants had reasonable grounds for concluding that Hyman's conduct was unacceptable and inconsistent with his role in the Yeshiva -- an inquiry that would inevitably enmesh a court in an application of religious law. With or without discovery, Justice Patterson writes, a court would be required in this case to assess the reasons for a religious institution's decision to terminate the employment of a minister, an inquiry that would violate the First Amendment.

**JUSTICE PIERRE-LOUIS, DISSENTING, joined by CHIEF JUSTICE RABNER and JUSTICE NORIEGA,** stresses that the present matter -- like defamation disputes generally -- does not inherently implicate the constitutional principles that informed the United States Supreme Court's ministerial exception decisions. Justice Pierre-Louis explains that plaintiff here contests what defendants said about his termination -- not the termination itself -- and that nothing about a defamation suit involves telling a religious institution who it can or cannot fire and for what reasons. Justice Pierre-Louis would hold that the ministerial exception does not automatically foreclose plaintiff's defamation claim and would allow him to proceed with limited discovery to determine if his claim is justiciable under McKelvey. There is a difference between allowing discovery to determine whether the alleged conduct occurred and discovery to determine whether the adverse action taken as a result of the alleged conduct was justified under Jewish law, Justice Pierre-Louis writes. Justice Pierre-Louis expresses concern that religious entities now have a blueprint for what to say in any public statement in order to not only bar a defamation claim by invoking the ministerial exception, but also to bar discovery.

**The members of the Court being equally divided, the judgment of the Appellate Division is AFFIRMED.**

**JUSTICE PATTERSON filed a concurrence, in which JUSTICES SOLOMON and FASCIALE join. JUSTICE PIERRE-LOUIS filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE NORIEGA join. JUSTICE WAINER APTER did not participate.**

3

SUPREME COURT OF NEW JERSEY

A-11 September Term 2023

087994

Shlomo Hyman,

Plaintiff-Appellant,

and

Freidi Hyman, Bracha
Hyman, Yaakov Hyman,
Aharon Hyman, Temima
Hyman, and Eliora Hyman
(a minor, by her parent and
guardian Shlomo Hyman),

Plaintiffs,

v.

Rosenbaum Yeshiva
of North Jersey, Adam
Mermelstein, Yehuda
Rosenbaum, and Daniel
Price,

Defendants-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
474 N.J. Super. 561 (App. Div. 2023).

| Argued | Decided |
|---|---|
| March 26, 2024 | July 24, 2024 |

1

Richard I. Scharlat argued the cause for appellant (Fox Rothschild, and Rivkin Law Group, attorneys; Richard I. Scharlat, of counsel and on the briefs, and Oleg Rivkin (Rivkin Law Group) of the New York and District of Columbia bars, admitted pro hac vice, on the briefs).

Akiva Shapiro (Gibson, Dunn & Crutcher) of the New York bar, admitted pro hac vice, argued the cause for respondents (Hartmann Doherty Rosa Berman & Bulbulia, and Gibson, Dunn & Crutcher, attorneys; Mark A. Berman, Jeremy B. Stein, and Akiva Shapiro, on the brief).

Peter G. Verniero argued the cause for amicus curiae New Jersey Catholic Conference (Sills Cummis & Gross, attorneys; Peter G. Verniero and Michael S. Carucci, of counsel and on the brief).

Laura Wolk Slavis of the Maryland and District of Columbia bars, admitted pro hac vice, argued the cause for amici curiae Diocese of Eastern America of the Serbian Orthodox Church, Eastern American Diocese of the Russian Orthodox Church Outside Russia, Romanian Orthodox Metropolia of the Americas, and the Antiochian Orthodox Christian Archdiocese of North America (The Becket Fund for Religious Liberty, attorneys; Richard C. Osborne, Laura Wolk Slavis, and Eric C. Rassbach of the California, Texas, and District of Columbia bars, admitted pro hac vice, on the brief).

Viviana M. Hanley, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, of counsel, and Viviana M. Hanley, on the brief).

Diane P. Sullivan submitted a brief on behalf of amici curiae Professor Michael W. McConnell and Professor Douglas Laycock (Weil, Gotshal & Manges, attorneys; Diane P. Sullivan, Jared R. Friedmann of the New York

2

bar, admitted pro hac vice, Shai Berman of the New York bar, admitted pro hac vice, Daniel M. Lifton of the New York bar, admitted pro hac vice, and Mark I. Pinkert of the Florida bar, admitted pro hac vice, on the brief).

Brian D. Mogck submitted a brief on behalf of amici curiae The National Council of Young Israel, The Jewish Coalition for Religious Liberty, Agudath Israel of America and Union of Orthodox Jewish Congregations of America (Walden Macht & Haran, attorneys; Brian D. Mogck, on the brief).

PER CURIAM

The six members of the Court who participated in this appeal unanimously agree that the standard set forth in in McKelvey v. Pierce, 173 N.J. 26, 51 (2002), applies in this case. The Court thus readopts that standard, with two refinements to accord with recent United States Supreme Court precedent, as set forth in Section III.C. of Justice Patterson's concurring opinion. See infra. at ___ (slip op. at 26-32). The members of the Court are equally divided as to whether discovery is required in this case. As a result, the judgment of the Appellate Division, which affirmed the trial court's dismissal of the case on summary judgment without discovery, is affirmed.

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." In accordance with that provision, the United States Supreme Court has recognized a "ministerial exception" requiring courts to "stay out of employment disputes involving" employees who hold "certain important positions with churches and other religious institutions" and are therefore deemed to be "ministers" for purposes of the exception. Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 745 (2020).

In this appeal, we apply the ministerial exception to defamation claims asserted by plaintiff Shlomo Hyman, a Judaic Studies teacher who was employed by defendant Rosenbaum Yeshiva of New Jersey, an Orthodox Jewish school. In 2019, after investigating claims of misconduct and consulting with legal counsel and authorities on Jewish law, Rosenbaum Yeshiva terminated Hyman's employment. In a letter, the Head of School advised parents and faculty members that the Yeshiva took that action because it deemed Hyman's conduct "neither acceptable nor consistent with how a rebbe in our Yeshiva should interact with students."

4

Hyman and six members of his family filed this action against Rosenbaum Yeshiva and three of its leaders.  Hyman asserted individual claims for age discrimination and defamation, and he and his family asserted other causes of action.  After discovery, which was limited to the question whether Hyman qualified as a "minister" for purposes of the First Amendment during his employment at the Yeshiva, he conceded that he was a minister and abandoned his age discrimination claim.  The trial court granted defendants' motion for summary judgment and dismissed the complaint.  It reasoned that if the claims were allowed to proceed to trial, they would entangle the court in matters of religious doctrine, thus violating the First Amendment.

Plaintiffs appealed, contending that the ministerial exception applied only to Hyman's age discrimination claim and that he could prove defamation under legal principles that would not implicate the First Amendment.  The Appellate Division affirmed the trial court's grant of summary judgment. Hyman v. Rosenbaum Yeshiva of N. Jersey, 474 N.J. Super. 561, 556 (App. Div. 2023).  The appellate court held that the ministerial exception bars tort claims if they are asserted by a party who constitutes a minister for purposes of the exception and the claims are "related to the religious institution's employment decision." Id. at 580.  The Appellate Division concluded that the defamation claims in this case met that test.  Ibid.

5

We granted Hyman's petition for certification. We adopt the standard prescribed in McKelvey v. Pierce, 173 N.J. 26, 51 (2002), subject to modifications conforming that standard to recent United States Supreme Court jurisprudence, as the governing test for a court's determination whether the ministerial exception bars a tort claim asserted by a religious institution's former employee who is a minister. Under McKelvey, a court must analyze each element of a challenged tort claim and determine whether the court's adjudication of that claim would require it to "choose between competing religious visions, or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers." Ibid. (internal quotation marks omitted). The court's inquiry is case-specific and turns on the facts and causes of action at issue in a given matter. Ibid.

Applying that standard to Hyman's defamation claims, we conclude that a court's determination of each element of those claims would mandate an inquiry into the religious tenets that govern Rosenbaum Yeshiva and would interfere with the Yeshiva's right to choose and supervise its ministers. Accordingly, we concur with the Appellate Division that the trial court properly granted defendants' motion for summary judgment dismissing plaintiffs' claims.

I.

A.

We summarize the facts based on the allegations of the complaint and the record presented to the trial court.

1.

Founded in 1979, Rosenbaum Yeshiva is an Orthodox Jewish school serving elementary and middle school students. The Yeshiva represents that it is "dedicated to continuing the chain of Jewish heritage by nurturing the joy and pursuit of a Torah way of life, in an environment that promotes Torah scholarship and academic excellence."

The rabbi who serves as Rosenbaum Yeshiva's Head of School, defendant Daniel Price, stated in a certification that his role is "to ensure that all significant decisions at the school are made in accordance with [the Yeshiva's] interpretation of Orthodox Jewish Law (halacha) and in consultation with gedolei Torah (leading Orthodox Jewish rabbis)." Price certified that "[d]etermining whether our religious rules are being followed is central to my job, as religion is infused in everything we do." The Yeshiva submitted to the trial court evidence of school rules applying halacha that govern members of the school community. Many were set forth in the staff handbook for the 2018-2019 academic year, including a provision stating that

7

"[s]taff members may not touch students of the opposite gender once the students have reached third grade." The handbook was incorporated in each teacher's annual employment agreement.

Rosenbaum Yeshiva represented to the trial court that when it hires Judaic Studies teachers, it looks for candidates who "have very strong backgrounds in the Orthodox Jewish faith," and "will consistently behave in accordance with halacha and will be able to model that behavior to their students." The Yeshiva states that it expects its Judaic Studies teachers to adhere to Orthodox Jewish observances and laws, including "restrictions on physical contact between people of different genders who are not relatives or spouses." According to Price, any decision by the Yeshiva to terminate the employment of a teacher, particularly a Judaic Studies teacher, is "guided by our intention to comply with our understanding of halacha, and our expectation that our teachers will do the same."

Hyman, a rabbi with a Bachelor of Arts degree in finance and a Master of Science degree in Jewish elementary school education, was hired by Rosenbaum Yeshiva in 1988. During his more than thirty years at the Yeshiva, he taught Judaic Studies to middle school girls and second grade boys, led students in morning prayers, participated in a school committee to formulate the Yeshiva's mission statement, and privately tutored students in

8

Judaic Studies. For some of the years during which Hyman taught, the Yeshiva granted him an annual parsonage allowance to cover a portion of his living expenses.

Prior to the allegations and investigation that gave rise to this action, no student or any other member of the school community had ever complained in writing that Hyman engaged in improper conduct or that his performance as a teacher was deficient. In the complaint and submissions to the trial court, plaintiffs quoted from or attached letters from defendant Yehuda Rosenbaum, the President of the Yeshiva, as well as letters from a former head of the Yeshiva, other former colleagues, alumni of the school, parents, and friends. In their letters, they praised Hyman's dedication to Orthodox Jewish tenets, his achievements as a teacher, his diligence, and his kindness to students and other members of the school community.

## 2.

According to Price's certification, in February 2019, he and other leaders of Rosenbaum Yeshiva learned from several former students of "allegations of inappropriate conduct" by Hyman, "including allegations of intentional physical contact." Rosenbaum Yeshiva placed Hyman on administrative leave.

Price stated that the Yeshiva's Board of Directors retained the law firm of Arnold & Porter Kaye Scholer LLP to investigate the allegations. In May

9

2019, the law firm presented its findings in a written report to Price and the Board of Directors. According to Price, the investigators found that former fifth and sixth grade female students had reported that Hyman "had intentionally touched them and other girls in his classes, including by massaging girls' shoulders, touching them on clothed parts of their bodies that he should not have touched, placing stickers on or near their chests, and creating classroom games that caused him to touch them."

Hyman and his family vehemently dispute those allegations. They assert in their complaint that the accusations represented nothing more than "decades old, unsubstantiated allegations of inappropriate interactions" between Hyman and former students, and that the investigative report is a "secret report, based on undisclosed allegations, some more than twenty (20) years old, from anonymously-presented accusers." They represent that the report of the investigation, the names of the accusers, and the exact nature, timing, and extent of the allegations have not been revealed to Hyman or his counsel.

According to Price, Rosenbaum Yeshiva consulted two respected rabbis who are recognized halachic authorities, seeking guidance "on how to proceed and appropriate next steps from a halachic perspective." Price certified that he was advised by the rabbis "on a number of issues raised by the allegations, including whether the alleged conduct violated Orthodox Jewish law and

standards of conduct, and whether, as a matter of Orthodox Jewish law," termination of Hyman's employment at the Yeshiva was the appropriate course of action.

Price asserted that the Yeshiva deemed Hyman's conduct to "not be acceptable or consistent with how a rebbe in our Yeshiva should interact with students," and that based on information presented to the Board, it was determined that Hyman's conduct "violated Orthodox Jewish standards of conduct" set forth in the staff handbook, including Hyman's "religious obligation to serve as a role model to his students as to what it means to live a Torah way of life."

On a date in May 2019 that the record does not reveal, Rosenbaum Yeshiva terminated Hyman's employment.

Price described steps that Rosenbaum Yeshiva took to determine whether and to what extent to inform its community about "the allegations against Hyman and the ultimate employment decision." He stated that the Yeshiva consulted again with the two rabbis recognized as halachic authorities and decided to send a letter to the school community regarding the decision to terminate Hyman's employment.

On May 15, 2019, Price e-mailed the following letter to the Board, parents of current students, and faculty members:

I am writing to let you know that Rabbi Shlomo Hyman, who has been on leave, will not be returning to RYNJ.

In late February, the leadership of the Yeshiva received information that warranted placing Rabbi Hyman on leave. At the same time, the Yeshiva also retained Arnold & Porter, a highly regarded national law firm to conduct an independent investigation. As a result of that process, it was determined that Rabbi Hyman's conduct had been neither acceptable nor consistent with how a rebbe in our Yeshiva should interact with students. In consultation with counsel and halachic advisors, the leadership of the Yeshiva has terminated his employment and has determined that no further action is necessary at this time. We are confident that this course of action is the right one for the school and its students.

Tomorrow, the students in Rabbi Hyman's classes will be notified that he will not be returning. I am sure that their current teachers will continue to guide them successfully through the remainder of the year. As always, our guidance staff is available to you and your children as needed.

I understand that this does not address every question you may have. However, given the sensitive nature of this situation, and the advice we have received from legal and halachic authorities, this is all the information that we can share at this time.

Thank you for your patience, support and understanding.

Plaintiffs allege that the letter was disseminated beyond its recipients in the school community on social media, and that Hyman was unfairly branded as a pedophile and child abuser on various websites, costing him employment

opportunities and imposing financial, social, and emotional harm on him and his family.

B.

1.

Plaintiffs filed this action on November 29, 2019. In the complaint, Hyman individually asserted claims for breach of contract, breach of the covenant of good faith and fair dealing, age discrimination pursuant to the Law Against Discrimination, N.J.S.A. 10:5-1 to -49, defamation, and tortious interference with future economic opportunities. All plaintiffs asserted claims for injurious falsehood, negligent infliction of emotional distress, and outrageous conduct causing emotional distress.

Hyman's defamation claims included (1) a claim that defendants "recklessly and negligently relied on old, vague, and false allegations to maliciously make false and defamatory statements" concerning him; (2) a claim that defendants "maliciously made false and defamatory per se statements" concerning him "including, without limitation, statements that falsely accuse or characterize [him] as having engaged in predatory conduct toward his students"; and (3) a claim that defendants "made false and defamatory statements" concerning him "that were phrased in a way to suggest

13

that [he] had engaged in inappropriate behavior toward his students, and which further miscast him as a pedophile."

Pursuant to Rule 4:6-2(e), defendants moved to dismiss the complaint for failure to state a claim, arguing in part that plaintiffs' claims were barred by the ministerial exception and the ecclesiastical abstention doctrine.[1] The trial court granted in part defendants' motion to dismiss. It dismissed without prejudice Hyman's individual claim for tortious interference with future economic opportunities, plaintiffs' claims for negligent infliction of emotional distress, and plaintiffs' claims for outrageous conduct causing emotional distress. The court declined to consider the ministerial exception or the ecclesiastical abstention doctrine without a factual record, and it accordingly denied defendants' motion to dismiss the remaining claims. The Appellate Division denied defendants' motion for leave to appeal the trial court's order,

---

[1] "The ecclesiastical abstention doctrine recognizes that the Establishment Clause of the First Amendment precludes judicial review of claims that require resolution of 'strictly and purely ecclesiastical' questions." McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc., 966 F.3d 346, 348 (5th Cir. 2020) (quoting Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 713 (1976)); see also Burri Law PA v. Skurla, 35 F.4th 1207, 1212 (9th Cir. 2022) ("The ecclesiastical abstention doctrine provides that a civil court may not adjudicate 'the correctness of an interpretation of canonical text or some decision relating to government of the religious polity.'" (quoting Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc., 819 F.2d 875, 878 n.1 (9th Cir. 1987))).

14

and the parties conducted discovery limited to the question whether Hyman was a "minister" for purposes of the First Amendment's ministerial exception.

After the completion of that discovery, defendants moved for summary judgment pursuant to Rule 4:46-2.  They argued that Hyman was a minister under the ministerial exception and that plaintiffs' claims were therefore barred on First Amendment grounds.  At oral argument, Hyman conceded that he "was a minister within the meaning of the ministerial exception."  He consented to the dismissal of his LAD age discrimination claim but opposed defendants' motion for summary judgment on the remaining claims, arguing that he was entitled to additional discovery.  Defendants countered that all of plaintiffs' remaining claims derived from Rosenbaum Yeshiva's decision to terminate Hyman's employment as a minister, and that the ministerial exception barred those claims as it barred Hyman's age discrimination claim.

The trial court granted defendants' motion for summary judgment and dismissed all of plaintiffs' claims with prejudice based on the ministerial exception and the ecclesiastical abstention doctrine.  The court noted that Rosenbaum Yeshiva officials justified the termination of Hyman's employment "as being consistent with religious law that controlled their school as interpreted by them and perhaps other religious authorities."  The court concluded that the Yeshiva's explanation for Hyman's termination -- in

15

combination with Hyman's admission that he was a minister under the First Amendment -- indicated that if the lawsuit were to continue, there would be "excessive entanglement with ecclesiastical liturgy or tenets."

2.

Acting as the sole appellant, Hyman appealed the trial court's grant of summary judgment dismissing his defamation claims.  He argued that the ministerial exception applies only to employment discrimination claims; that the trial court had conflated the ministerial exception and the ecclesiastical abstention doctrine; and that the trial court should have ordered additional discovery before granting summary judgment.

Relying solely on the ministerial exception, the Appellate Division affirmed the trial court's judgment.  Hyman, 474 N.J. Super. at 572-83.  The appellate court invoked the United States Supreme Court's decision in Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC, 565 U.S. 171, 181 (2012), in which the Court declined to limit the exception to settings in which a religious institution fires a minister for a religious reason or the minister seeks reinstatement rather than damages.  Id. at 575-76.  The Appellate Division also cited the Supreme Court's observation in Our Lady of Guadalupe that judicial intervention between a religious school and a teacher entrusted "with the responsibility of educating and forming students in the

16

faith" would threaten a religious school's independence and violate the First Amendment. Id. at 576 (quoting 591 U.S. at 762).

The Appellate Division noted that "[i]n New Jersey, there is no published case directly addressing whether the ministerial exception applies to cases beyond employment discrimination cases." Id. at 576. It found persuasive, however, the reasoning in decisions from other jurisdictions applying the ministerial exception to claims not premised on allegations of employment discrimination. Id. at 576-80.

With no reference to McKelvey, the Appellate Division held that "the ministerial exception applies to bar tort claims, provided (1) the injured party is a minister formerly employed by a religious institution and (2) the claims are related to the religious institution's employment decision." Id. at 580. Noting that Hyman had conceded his status as a minister and that the defamation claims related to Rosenbaum Yeshiva's decision to terminate his employment, the Appellate Division found that the ministerial exception barred those claims. Id. at 580-83. The appellate court did not consider the ecclesiastical abstention doctrine. Id. at 583.

### 3.

We granted Hyman's petition for certification. 255 N.J. 419 (2023). We also granted amicus curiae status to (1) the Attorney General; (2) the National

Council of Young Israel, the Jewish Coalition for Religious Liberty, Agudath Israel of America, and Union of Orthodox Jewish Congregations of America, jointly represented; (3) the New Jersey Catholic Conference; (4) the Diocese of Eastern America of the Serbian Orthodox Church, Eastern American Diocese of the Russian Orthodox Church Outside Russia, Romanian Orthodox Metropolia of the Americas, and the Antiochian Orthodox Christian Archdiocese of North America, jointly represented; and (5) Professor Michael W. McConnell and Professor Douglas Laycock, jointly represented.

## II.

### A.

Hyman argues that the ministerial exception, intended to ensure that a religious institution is not compelled to retain a minister who does not share its faith and mission, applies only to employment disputes and is irrelevant to defamation claims. He views the Appellate Division's two-pronged test for the application of the ministerial exemption to tort claims to contravene this Court's decision in McKelvey, 173 N.J. at 51-53, and asserts that under McKelvey, his defamation claims are beyond the reach of the exception. Hyman contends that the trial court should not have granted summary judgment without ordering discovery beyond the limited discovery that the parties conducted.

18

B.

Defendants assert that in <u>Hosanna-Tabor</u> and <u>Our Lady of Guadalupe</u>, the United States Supreme Court envisioned that the ministerial exception applies to any claim arising from a religious institution's termination of a minister's employment. They argue that the Appellate Division's decision is consistent with both the Supreme Court's jurisprudence and this Court's decision in <u>McKelvey</u>. Defendants contend that if a court were to determine the truth of Rosenbaum Yeshiva's explanation for Hyman's termination, it would be compelled to evaluate the Yeshiva's application of religious law, thus violating the First Amendment.

C.

The Attorney General takes no position with respect to the specific claims at issue in this appeal, but urges the Court to reaffirm the <u>McKelvey</u> test, which amicus maintains is still good law after the United States Supreme Court's decisions in <u>Hosanna-Tabor</u> and <u>Our Lady of Guadalupe</u>.

D.

The National Council of Young Israel, the Jewish Coalition for Religious Liberty, Agudath Israel of America, and Union of Orthodox Jewish Congregations of America view Rosenbaum Yeshiva's communication with its community to be a natural incident of the Yeshiva's authority to decide matters

19

of governance, faith, and doctrine.  Amici contend that a court's evaluation of that communication in a defamation action would give rise to excessive entanglement between church and state.

E.

The New Jersey Catholic Conference asserts that a religious organization's freedom to explain to a congregation the circumstances of a minister's removal is integral to its community and that discovery on the merits of this case would intrude into Rosenbaum Yeshiva's constitutionally protected determination that Hyman's conduct did not conform to Jewish law.

F.

The Diocese of Eastern America of the Serbian Orthodox Church, Eastern American Diocese of the Russian Orthodox Church Outside Russia, Romanian Orthodox Metropolia of the Americas, and the Antiochian Orthodox Christian Archdiocese of North America state that although the ministerial exception should not affect tort claims arising from personal injury, battery, false imprisonment, or sexual harassment, it bars the defamation claims in this case, which arose from an employment decision that Rosenbaum Yeshiva made after consulting with religious authorities.

G.

Professor Michael W. McConnell and Professor Douglas Laycock argue that the ministerial exception is part of a broader doctrine that prohibits courts from adjudicating any claim that would interfere with the protected decisions of religious authorities, and they contend that it bars Hyman's defamation claims in this appeal.

III.

A.

We review a grant of summary judgment under the same standard that governs the trial court when it decides a motion for summary judgment. Samolyk v. Berthe, 251 N.J. 73 (2022). Under Rule 4:46-2(c), a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."

B.

The ministerial exception at the center of this appeal "developed to protect churches from government action that interferes with a church's internal affairs management, such as the core right to choose and regulate members of its own clergy." McKelvey, 173 N.J. at 44. The exception derives

21

from both the Free Exercise and Establishment Clauses of the First Amendment; as the United States Supreme Court has observed, "[s]tate interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even influence such matters would constitute one of the central attributes of an establishment of religion." Our Lady of Guadalupe, 591 U.S. at 746. "[B]oth Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers." Hosanna-Tabor, 565 U.S. at 181.

In Hosanna-Tabor, 565 U.S. at 188-96, and Our Lady of Guadalupe, 591 U.S. at 746-62, the Supreme Court applied the ministerial exception in employment discrimination settings, focusing its inquiry on the fact-sensitive question whether a religious organization's former employee constituted a "minister" under the First Amendment.

Hosanna-Tabor arose from an action brought by the federal Equal Opportunity Employment Commission (EEOC) against a congregation of the Lutheran Church, in which the EEOC claimed that the church had fired an elementary school teacher in retaliation for her threat to assert a claim against it under the Americans with Disabilities Act. 565 U.S. at 180. The church contended that the First Amendment barred the action because the teacher constituted a minister under the First Amendment and had been terminated

22

because her threat to sue the church violated its belief "that Christians should resolve their disputes internally."  Ibid.

The United States District Court granted the congregation's motion for summary judgment, holding that the congregation had properly characterized the teacher as a "minister" for purposes of the First Amendment and that the court accordingly could "inquire no further into her claims of retaliation."  Id. at 181.  The Court of Appeals for the Sixth Circuit vacated the district court's judgment and remanded for consideration of the teacher's retaliation claims. Ibid.

The United States Supreme Court reversed the Sixth Circuit's determination.  Id. at 196.  Explaining the constitutional role of the ministerial exception, the Court observed that

> [t]he members of a religious group put their faith in the hands of their ministers.  Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision.  Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.  By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments.  According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

23

[Id. at 188-89.][2]

The Supreme Court rejected the contention of the EEOC and the teacher that the ministerial exception should not apply because the religious reason cited by the church was pretextual; it held instead that the exception's purpose "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful -- a matter 'strictly ecclesiastical' -- is the church's alone." Id. at 194-95 (quoting Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 119 (1952)).

The Supreme Court also dispensed with the notion that the ministerial exception is limited to settings in which a minister seeks the remedy of reinstatement to the ministerial position; the Supreme Court considered it "immaterial" that the teacher had abandoned her claim for reinstatement, and stated that an award of damages and attorneys' fees "would operate as a penalty on the [c]hurch for terminating an unwanted minister, and would be no

_____

[2] In Hosanna-Tabor, the Supreme Court resolved a conflict among federal appellate courts as to "whether the ministerial exception is a jurisdictional bar or a defense on the merits," concluding that it "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." 565 U.S. at 195 n.4.

24

less prohibited by the First Amendment than an order overturning the termination." Id. at 194.

Based on the teacher's title of "minister" and her religious responsibilities in the congregation, the Supreme Court held that the ministerial exception barred her employment discrimination claim. Id. at 192-94. The Court expressed "no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." Id. at 196. It stated that "[t]here will be time enough to address the applicability of the exception to other circumstances if and when they arise." Ibid.

Eight years after deciding Hosanna-Tabor, the Supreme Court again analyzed the ministerial exception in Our Lady of Guadalupe, 591 U.S. at 746-62. There, the Court applied the exception to bar employment discrimination actions filed by two teachers terminated from their positions in a Catholic elementary school. Ibid.

Although neither teacher in Our Lady of Guadalupe held the title of "minister" or an analogous religious title or had received religious training comparable to that given to the teacher in Hosanna-Tabor, the Court found that "their core responsibilities as teachers of religion were essentially the same" as the responsibilities assigned to the plaintiff in that case. Ibid. It observed that

25

"[t]he religious education and formation of students is the very reason for the existence of most private religious schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." Id. at 738.

The Court held that "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." Id. at 762. The Court cautioned judges to "take care to avoid 'resolving underlying controversies over religious doctrine.'" Id. at 751 n.10 (quoting Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 449 (1969)).

C.

The United States Supreme Court has not had occasion to apply the ministerial exception to a tort claim such as the defamation claim at issue here, and indeed cautioned that such an inquiry must await an appropriate case. Hosanna-Tabor, 565 U.S. at 196.[3] A decade before Hosanna-Tabor, however,

---

[3] We note that appellate courts in several of our sister jurisdictions have applied the ministerial exception to bar defamation claims and related claims filed by former ministers against religious institutions. See Sumner v. Simpson Univ., 238 Cal. Rptr. 3d 207, 221-23 (Ct. App. 2018) (dismissing

26

this Court prescribed a standard for courts to apply when they determine whether a given claim is barred by the exception. McKelvey, 173 N.J. at 32-33, 51-52.

In McKelvey, the plaintiff, a former seminarian who alleged that he was sexually harassed by employees of the Diocese of Camden, asserted several contract and tort claims. Id. at 36-37. The trial court dismissed the claims, based in part on its conclusion that it could not attempt a purely secular interpretation of the religious documents underlying the case without violating the First Amendment. Id. at 37. The Appellate Division affirmed. Ibid.

This Court observed that in a challenge to an action against a religious institution based on the First Amendment, "the threshold inquiry is whether the

---

defamation and other tort claims by a seminary's former dean against her former employer that were based on statements made by the employer about the seminary's prior termination of the dean and "the reasons and procedure for her final termination"); Ind. Area Found. of United Methodist Church, Inc. v. Snyder, 953 N.E.2d 1174, 1180 (Ind. Ct. App. 2011) (barring a former pastor's defamation claim based on statements to mental health providers and parishioners because they related to the suitability of the plaintiff to fill a ministerial position); Gunn v. Mariners Church, Inc., 84 Cal. Rptr. 3d 1, 2-3 (Ct. App. 2008) (applying the ministerial exception to dismiss a former church worship director's claims for defamation and other tort claims following his termination); Patton v. Jones, 212 S.W.3d 541, 552-55 (Tex. Ct. App. 2006) (dismissing a former pastor's defamation claims against his former employer on the basis of the ministerial exception); Bourne v. Ctr. on Child., Inc., 838 A.2d 371, 373 (Md. Ct. Spec. App. 2003) (barring a former pastor's claims for defamation and false light claims that were premised on a letter that his former employer, a church, had sent to church members to explain his termination).

27

underlying dispute is a secular one, capable of review by a civil court, or an 'ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom or law."'" Id. at 45 (quoting Bell v. Presbyterian Church (U.S.A.), 126 F.3d 328, 331 (4th Cir. 1997)). The Court held that

> [b]efore barring a specific cause of action, a court first must analyze each element of every claim and determine whether adjudication would require the court to choose between "competing religious visions," or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers. In so doing, a court may "interpret provisions of religious documents involving property rights and other nondoctrinal matters as long as the analysis can be done in purely secular terms."
>
> [Id. at 51-52 (quoting Minker v. Balt. Annual Conf. of United Methodist Church, 894 F.2d 1354, 1358 (D.C. Cir. 1990)).]

In McKelvey, the Court found that the trial court and Appellate Division had "failed to recognize that the protections afforded to churches by the Religion Clauses of the First Amendment are highly nuanced and not monolithic," and had "failed to analyze each and every claim" in the plaintiff's "complaint to determine whether adjudication would require a determination of competing religious visions or interfere with church administration or choice." Id. at 53-54. This Court therefore reversed the judgment of the Appellate Division and remanded the matter to the trial court for the

28

development of a record as to the basis of the plaintiff's claims, commenting on the evidence that might be developed in such a remand and the legal principles that the trial court would apply to such evidence on remand. Id. at 53-59.

The Court thus prescribed in McKelvey a procedure that a judge can apply to determine whether the ministerial exception bars a tort claim against a religious institution such as the defamation claims at issue here: a court should individually assess each element of that claim and decide whether the court's determination of the claim would require it "to choose between competing religious visions, or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers." Id. at 51 (quotation omitted). If adjudication raises no such First Amendment concerns, the court may decide the claim; if not, it must dismiss it. Ibid.

We note two aspects of the Court's analysis in McKelvey that cannot be reconciled with the United States Supreme Court jurisprudence that followed.

First, the Court stated in McKelvey that the Free Exercise Clause bars a claim only when "[t]he conduct at issue [was] part of the beliefs and practices of the defendant's religion," and that the church autonomy doctrine premised on that Clause "is implicated only in those situations where 'the alleged

29

misconduct is "rooted in religious belief.""" McKelvey, 173 N.J. at 40, 42

(quoting Bryce v. Episcopal Church in the Diocese of Colo., 289 F.3d 648, 657

(10th Cir. 2002)). To the extent that this aspect of our holding in McKelvey

can be read in a way that conflicts with the Supreme Court's recent

jurisprudence in employment discrimination cases, such a reading cannot

prevail. See Our Lady of Guadalupe, 591 U.S. at 760 (noting that the

ministerial exception applies when a church dismisses its minister not only

upon concluding that "the minister has gone over to some other faith" but also

when it determines "simply that the minister is failing to perform essential

functions in a satisfactory manner"); Hosanna-Tabor, 565 U.S. at 194-95

(holding that the ministerial exception exists not only to safeguard a church's

decision to fire a minister "when it is made for a religious reason," but to

ensure that "the authority to select and control who will minister to the faithful

-- a matter 'strictly ecclesiastical' -- is the church's alone"). The ministerial

exception is clearly not limited to employment decisions made by religious

institutions on religious grounds. Ibid.

Second, in McKelvey, this Court invoked federal case law decided

before Hosanna-Tabor and Our Lady of Guadalupe in which the courts

concluded that an action for damages against a religious institution, in contrast

to an action for reinstatement to the ministerial position, would not interfere

30

with church autonomy. McKelvey, 173 N.J. at 45-49 (citing Bollard v. Cal. Province of the Soc'y of Jesus, 196 F.3d 940, 944-50 (9th Cir. 1999); Minker, 894 F.2d at 1355-61). This Court suggested that if the plaintiff in McKelvey were to prove certain of his claims, "those claims, and others lurking in the margins of [the] complaint, could give rise to monetary damages, the imposition of which would not excessively entangle church and state." Id. at 58. The Court mandated, as a step in the analysis, that the court "examine the remedies sought by the plaintiff and decide whether enforcement of a judgment would require excessive procedural or substantive interference with church operations." Id. at 52.

In Hosanna-Tabor, however, the Supreme Court rejected the notion that an action for monetary damages -- as opposed to an action seeking reinstatement to the position from which the minister has been terminated -- does not raise First Amendment concerns, making clear that actions for both categories of remedies may offend the First Amendment. 565 U.S. at 194. Consequently, the distinction that the McKelvey Court drew among remedies is no longer consonant with Supreme Court jurisprudence when it comes to claims of employment discrimination in the selection of ministers generally. See ibid; McKelvey, 173 N.J. at 52, 58. Accordingly, we do not adopt as part of our holding today the language in McKelvey suggesting that a minister's

31

claim for damages in the employment discrimination setting does not implicate the First Amendment.

Subject to those caveats, we reaffirm McKelvey's holding that when a court is charged to determine whether a particular claim asserted by a minister against a religious institution runs afoul of the First Amendment, the court must first analyze each element of that claim and "determine whether adjudication would require the court to choose between competing religious visions, or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers."  173 N.J. at 51 (quotation omitted).  We view that standard to hew more closely to the constitutional principles underlying the ministerial exception than the standard set forth by the Appellate Division in this case, which would require only a finding that the former employee was a minister and that the claim is "related to the religious institution's employment decision."  Hyman, 474 N.J. Super. at 580.

IV.

We apply the McKelvey standard, as modified, to Hyman's defamation claims against Rosenbaum Yeshiva.

32

## A.

We first review the elements of a cause of action for defamation under New Jersey law. See McKelvey, 173 N.J. at 51-52.

"The law of defamation attempts to strike 'the proper balance between protecting reputation and protecting free speech.'" G.D. v. Kenny, 205 N.J. 275, 292 (2011) (quoting Ward v. Zelikovsky, 136 N.J. 516, 528 (1994)). The elements of a defamation claim in New Jersey are (1) "the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585 (2009) (quoting DeAngelis v. Hill, 180 N.J. 1, 13 (2004)); see also Kenny, 205 N.J. at 292-93. Truth is an absolute defense to a defamation claim. Kenny, 205 N.J. at 293.

"A defamatory statement is one that is false and is injurious to the reputation of another or exposes another person to hatred, contempt or ridicule" or subjects another person to a loss of the good will and confidence in which he or she is held by others." Decker v. Princeton Packet, Inc., 116 N.J. 418, 425-26 (1989) (internal quotation marks omitted) (citing Mosler v. Whelan, 28 N.J. 397, 400 (1958); Leers v. Green, 24 N.J. 239, 251 (1957)). "To determine if a statement has a defamatory meaning, a court must consider

33

three factors: '(1) the content, (2) the verifiability, and (3) the context of the challenged statement.'" Leang, 198 N.J. at 585 (quoting DeAngelis, 180 N.J. at 14). "[A] court looks 'to the fair and natural meaning [to be given to the statement] by reasonable persons of ordinary intelligence.'" Kenny, 205 N.J. at 293 (second alteration in original) (quoting Romaine v. Kallinger, 109 N.J. 282, 290 (1988)).

The second element of the defamation standard requires proof that the defendant published a communication not subject to any privilege, a term that denotes in defamation law "the fact that conduct which, under ordinary circumstances, would subject the actor to liability, under particular circumstances does not subject him to such liability." Restatement (Second) of Torts (Restatement) § 10(1) (Am. Law Inst. 1965).[4]

> A privilege may be based on
>
> > (a) the consent of the other affected by the actor's conduct, or
> >
> > (b) the fact that its exercise is necessary for the protection of some interest of the actor or of the public which is of such importance as to justify the harm caused or threatened by its exercise, or
> >
> > (c) the fact that the actor is performing a function for the proper performance of which freedom of action is essential.

---

[4] "Our courts have defined defamation consistently with . . . the Restatement (Second) of Torts . . . ." DeAngelis, 180 N.J. at 12.

[Id. § 10(2)].

"Publication" of a defamatory statement denotes "its communication intentionally or by a negligent act to one other than the person defamed." Id. § 577(1) (Am. Law Inst. 1977).

The third element of a cause of action for defamation is "fault amounting at least to negligence." Leang, 198 N.J. at 585 (quoting DeAngelis, 180 N.J. at 13); see also W.J.A. v. D.A., 210 N.J. 229, 242 (2012) ("New Jersey, like many other states, maintains a fault standard of negligence for defamation cases involving private-figure defendants.") Negligence is defined as "conduct that creates an unreasonable risk of harm." Restatement § 580B cmt (g) (Am. Law Inst. 1977). As it relates to the truth or falsity of a statement alleged to be defamatory, "the question of negligence has sometimes been expressed in terms of the defendant's state of mind by asking whether he had reasonable grounds for believing that the communication was true," and in terms of the defendant's conduct by asking "whether the defendant acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it." Ibid.

B.

We next consider the inquiry that a court would be required to undertake were it to determine Hyman's defamation claims in the factual setting of this appeal. See McKelvey, 173 N.J. at 51-52.

Hyman's claims center on a core passage in Price's letter to the Yeshiva's Board, parents, and faculty. After advising the Yeshiva community that its leadership had "received information that warranted placing Rabbi Hyman on leave," and had retained the law firm to "conduct an independent investigation," Price wrote that, "[a]s a result of that process, it was determined that Rabbi Hyman's conduct had been neither acceptable nor consistent with how a rebbe in our Yeshiva should interact with students." In his letter, Price added that the Yeshiva's leadership had decided, "in consultation with counsel and halachic authorities," to terminate Hyman's employment. Price's letter thus did not assert specific factual allegations regarding Hyman's conduct; it included only a vague reference to the students' claims in its description of the decision-making process that led to Hyman's termination.

To determine the first element of Hyman's defamation claims, a court would be required to assess the veracity of Price's message that Rosenbaum Yeshiva had deemed Hyman's conduct to be unacceptable and inconsistent

36

with the manner in which a rabbi in his position was expected to interact with students. That statement is inextricably intertwined with the Jewish law that governs the Yeshiva's operations. A court simply could not determine the letter's truth or falsity for purposes of the defamation claim's first element without assessing and attempting to apply that religious law. Any such decision would impermissibly interfere with the Yeshiva's prerogative to choose and manage its ministers. See Our Lady of Guadalupe, 591 U.S. at 746-47; Hosanna-Tabor, 565 U.S. at 181; McKelvey, 173 N.J. at 51. Moreover, were a court to assess the truth or falsity of Price's representation to the community that the Yeshiva's decision was premised in part on the advice of halachic authorities, it could not avoid entanglement in communications among religious leaders interpreting religious law. Ibid. The court would be required to delve into Jewish law to determine what contact with children is allowed and is not allowed.

Similar concerns would arise if a court were to decide whether Price's letter to the Rosenbaum Yeshiva school community is defamatory, as is also required under the first element of the claim. See Leang, 198 N.J. at 585. Hyman alleges that the letter was defamatory because it stated or suggested that he had engaged in predatory conduct toward his students, and that it miscast him as a pedophile. A court assessing that claim would be compelled

to scrutinize the letter's comment about the manner in which "a rebbe in our Yeshiva should interact with students" in order to determine the meaning of that comment. That inquiry would necessarily entail an exploration of rules imposed by the Yeshiva addressing physical contact between teachers and students of the opposite gender. Were a court to assess the content, verifiability, and context of the specific statements at issue in order to determine whether they were defamatory, it would unavoidably venture into the realm of religious law.

To decide the second prong of the defamation test -- the unprivileged publication of the statement at issue -- a court would be required to determine whether any privilege shields Price's letter to the school community. See Restatement § 10(1). Such a privilege can be premised, among other bases, on the "fact that its exercise [was] necessary for the protection of some interest" of the defendant "or of the public which is of such importance as to justify the harm caused or threatened by its exercise," id. § 10(2)(b), or on "the fact that the actor is performing a function for the proper performance of which freedom of action is essential," id. § 10(2)(c).

Applied to these facts, the test for a privileged communication would implicate religious law not only with regard to the contents of the letter, but also with respect to the scope of Rosenbaum Yeshiva's publication of the letter

38

to members of the school community. A court would decide whether defendants acted to protect an interest of sufficient magnitude to justify any harm that the letter caused or threatened, and whether writing the letter was a reasonable measure for a school administrator charged to protect students and educate them in accordance with Jewish law. Those determinations would clearly involve the court in an exploration of Jewish law.

Finally, adjudication of the negligence element of Hyman's defamation claims would entangle the court in a decision rooted in religious law. To decide whether defendants acted negligently in drafting and sending the letter, a court would be required to determine whether defendants "had reasonable grounds for believing" that the statements in the letter were true, and whether they "acted reasonably in checking on the truth or falsity or defamatory character of the communication before publishing it." Restatement § 580B cmt (g). To apply that test to the statement at the heart of Hyman's claim -- that defendants, advised by counsel and authorities on Jewish law, had determined his conduct unacceptable and inconsistent with his role as rabbi in the Yeshiva -- the court would be compelled to decide whether defendants had reasonable grounds for reaching that conclusion. Any such inquiry would inevitably enmesh a court in an application of religious law.

Accordingly, applying <u>McKelvey</u>'s standard as amended, we conclude that a civil court's adjudication of each element of Hyman's defamation claims would unconstitutionally interfere with the Yeshiva's authority to select and govern its ministers, and that the ministerial exception therefore bars those claims. <u>See</u> <u>McKelvey</u>, 173 N.J. at 51-52.

Contrary to the assertion of our dissenting colleagues, we do not hold that every defamation claim asserted by a plaintiff who is a minister for First Amendment purposes is barred by the ministerial exception. <u>See</u> <u>post</u> at ___ (slip op. at 4, 9-10, 15-16). Nor do we prospectively resolve a hypothetical case -- starkly different from this appeal -- in which an employer, after lawfully terminating a minister, issues a false statement labeling its former employee a pedophile. <u>See</u> <u>post</u> at ___ (slip op. at 13-14). In accordance with <u>McKelvey</u>, our holding is premised on the precise content of the statement that Hyman alleges to be defamatory, the elements of the defamation claims at issue here, and the specific inquiry that a court would undertake in order to resolve those claims. <u>See</u> <u>McKelvey</u>, 173 N.J. at 51-52. In short, we decide this case and this case alone.

C.

Finally, we reply to our dissenting colleagues' argument that this case should not be decided until Hyman is afforded additional discovery. <u>Post</u> at

40

___ (slip op. at 10-14).  In many settings, the discovery at issue would be warranted before a court determines whether the First Amendment bars a minister's claim.  We do not view this case to present such a setting, however.

The dissent specifically maintains that Hyman is entitled to "discovery to determine whether the alleged conduct occurred at all and to uncover the underlying facts supporting the allegations," including the investigative report prepared by Arnold & Porter, as distinct from "discovery to determine whether the adverse action taken as a result of the alleged conduct was justified under Jewish law."  Post at ___ (slip op. at 12, 15-16).

Again, under McKelvey, the analysis focuses entirely on the specific claims before the Court.  173 N.J. at 51-52.  Here, the religious employer's allegedly defamatory statement was not a description of claimed misconduct by Hyman; no such description appears in Price's letter to the school community.  Instead, Hyman's defamation claims are premised on Price's statement that "it was determined that Rabbi Hyman's conduct had been neither acceptable nor consistent with how a rebbe in our Yeshiva should interact with students."  In short, the statement at the heart of this case was not an assertion of fact about the former students' allegations, but an explanation of the Yeshiva's decision to terminate Hyman -- a determination made in consultation with halachic authorities as well as legal counsel.  With or

41

without discovery regarding the details of the allegations, the court's inquiry as to the merits would be the same:  the court would be required to assess the reasons for a religious institution's decision to terminate the employment of a minister, an inquiry that would violate the First Amendment.  See Our Lady of Guadalupe, 591 U.S. at 746-52; Hosanna-Tabor, 565 U.S. at 188-96.

It is therefore clear that additional discovery would not alter the constitutional analysis in this matter.  We decline to remand for such discovery.


JUSTICE PATTERSON filed a concurrence, in which JUSTICES SOLOMON and FASCIALE join.  JUSTICE PIERRE-LOUIS filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE NORIEGA join.  JUSTICE WAINER APTER did not participate.

42

Shlomo Hyman,

Plaintiff-Appellant,

and

Freidi Hyman, Bracha
Hyman, Yaakov Hyman,
Aharon Hyman, Temima
Hyman, and Eliora Hyman
(a minor, by her parent and
guardian Shlomo Hyman),

Plaintiffs,

v.

Rosenbaum Yeshiva
of North Jersey, Adam
Mermelstein, Yehuda
Rosenbaum, and Daniel
Price,

Defendants-Respondents.

JUSTICE PIERRE-LOUIS, dissenting.

The United States Supreme Court first explicitly recognized the ministerial exception in <u>Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC</u>, holding that the exception "ensures that the authority to select and control who will minister to the [religious institution's] faithful -- 'a matter strictly ecclesiastical' -- is the church's alone." 565 U.S. 171, 194-95

(2012) (quoting <u>Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.</u>, 344 U.S. 94, 119 (1952)). The Court emphasized that the matter before it was an employment discrimination case, and it "express[ed] no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers." <u>Id.</u> at 196.

Eight years after <u>Hosanna-Tabor</u>, the Supreme Court described that decision as establishing a rule that "courts are bound to stay out of <u>employment disputes</u> involving those holding certain important positions with . . . religious institutions," and noted that it had "unanimously recognized that the Religion Clauses foreclose certain <u>employment discrimination</u> claims brought against religious organizations." <u>Our Lady of Guadalupe Sch. v. Morrissey-Berru</u>, 591 U.S. 732, 746-47 (2020) (emphases added). The Court explained that the ministerial exception's "constitutional foundation" was protecting "church autonomy," i.e., "independence in matters of faith and doctrine and in closely linked matters of internal government." <u>Id.</u> at 747.

There is no dispute that Supreme Court precedent pursuant to the First Amendment's Religion Clauses forecloses certain employment discrimination suits brought by ministers against religious institutions. This, however, is not an employment discrimination case, and the ministerial exception "does not

2

mean that religious institutions enjoy a general immunity from secular laws."
Id. at 746. The constitutional principle underpinning the ministerial exception
-- protecting the autonomy of religious institutions to select and control who
will minister to their faithful -- a principle inherent in decisions to hire, fire,
and manage employees, is in certain circumstances entirely inapplicable to
some secular laws, including the law of defamation. Ibid.

Over two decades ago -- before Hosanna-Tabor and Our Lady of
Guadaulupe -- this Court held that in tort cases involving religious institutions,
New Jersey courts "first must analyze each element of every claim and
determine whether adjudication would require the court to choose between
competing religious visions, or cause interference with a church's
administrative prerogatives, including its core right to select, and govern the
duties of, its ministers" before barring a claim. McKelvey v. Pierce, 173 N.J.
26, 51 (2002) (internal quotation marks omitted). Because the Supreme Court
specifically declined to speak on the ministerial exception's applicability
outside the employment discrimination context, Hosanna-Tabor and Our Lady
of Guadalupe do not govern the outcome here and do not require that we alter
our jurisprudence regarding the manner in which we assess non-employment
discrimination claims brought by employees against religious entities. Instead,
we should determine whether adjudicating this defamation claim requires a

3

court to "choose between competing religious visions" or interfere with a religious institution's selection and governance of ministers. Ibid.

In order for a court to make that determination in this case -- or in any defamation case -- plaintiffs must be allowed discovery. Only after discovery can a court comply with McKelvey's mandated inquiry. But under the concurring opinion's analysis, a religious entity can seemingly fire an employee based solely on a personal vendetta, publish a knowingly false and defamatory statement about the plaintiff, and shield itself from liability -- and even discovery -- by invoking the ministerial exception. Such a holding slams the courthouse door shut on potentially wronged plaintiffs before they can even obtain discovery that would allow a court to determine whether adjudicating their claims actually interferes with religious autonomy. McKelvey's analysis is only possible by allowing plaintiffs discovery, and we should not foreclose plaintiff from pursuing his claim without it.

Unfortunately, the concurrence endorses a framework that edges close to granting religious institutions general immunity from tort claims brought by ministerial employees if they use the correct terminology to invoke the exception. I cannot countenance such a result. Therefore, I respectfully dissent.

I.

A.

Although <u>Hosanna-Tabor</u> was the first time the United States Supreme Court recognized the "ministerial exception" by that name, the Court had for decades prescribed the principle that the Free Exercise Clause prohibits secular courts from adjudicating disputes involving internal church management or competing religious doctrinal views. <u>See</u> <u>Hosanna-Tabor</u>, 565 U.S. at 185-87 (discussing cases). For example, in <u>Watson v. Jones</u>, the Court declined to weigh a dispute between competing factions of a church in Louisville over who rightfully controlled church property, instead deferring to the final decision of the religious institution's highest authority. 80 U.S. 679, 727 (1872). In so holding, the Court explained that courts must defer to a religious institution's internal resolution of "questions of discipline, or of faith, or ecclesiastical rule, custom, or law." <u>Ibid.</u>

Similarly, the Court in <u>Kedroff</u> refused to disturb the Supreme Church Authority of the Russian Orthodox Church's decision that it rightfully controlled real property in New York against a challenge from the church's North American faction. 344 U.S. at 96-97. The Court explained that courts have no business in "matters of church government as well as those of faith and doctrine." <u>Id.</u> at 116. The Court later extended those principles to the

5

employment context in <u>Serbian Eastern Orthodox Diocese for United States &</u> <u>Canada v. Milivojevich</u> by declining to consider a bishop's challenge to a religious institution's decision to terminate his employment because the bishop defied the institution's authority.  426 U.S. 696, 720 (1976).

In <u>Hosanna-Tabor</u>, the Court held that <u>employment discrimination</u> claims brought by ministers against religious institutions are nonjusticiable because they inherently require courts to intervene in matters of internal church governance.  565 U.S. at 188.  There, the Equal Employment Opportunity Commission sued a congregation of the Lutheran Church, claiming that the church fired an elementary school teacher in retaliation for threatening to file a lawsuit alleging disability discrimination.  <u>Id.</u> at 177-80. The Court ultimately concluded that the ministerial exception barred the claim because such a claim could "interfere[] with the internal governance of the church, <u>depriving the church of control over the selection of those who will</u> <u>personify its beliefs</u>."  <u>Id.</u> at 188 (emphasis added).  Furthermore, the Court elaborated that the ministerial exception's purpose "is not to safeguard a church's decision to fire a minister only when it is made for a religious reason," but rather to ensure that a church retains control over its internal governance and decisions regarding who administers its faith.  <u>Id.</u> at 194-95.

6

The Court expanded upon <u>Hosanna-Tabor</u> in <u>Our Lady of Guadalupe</u>, a case in which two teachers who were fired by Roman Catholic primary schools sued the schools alleging employment discrimination.  591 U.S. at 738.  After noting that the ministerial exception was intended to keep courts out of "employment disputes," <u>id.</u> at 746, the Court concluded that the teachers were in fact "ministers" who fell under the exception, <u>id.</u> at 756-57.[1]

B.

The matter before us -- like defamation disputes generally -- does not inherently implicate the constitutional principles that informed the decisions in <u>Hosanna-Tabor</u> and <u>Our Lady of Guadalupe</u>.  This is not an employment discrimination case.  The issue is not whether defendants lawfully terminated plaintiff.  No one challenges the propriety of defendants' adverse employment action.  More broadly, no one asks a secular court to interfere with a religious institution's internal management decision or with whom the religious entity chooses to minister to its faithful.  What plaintiff contests is <u>what defendants</u>

---

[1] Notably, <u>Hosanna-Tabor</u> and <u>Our Lady of Guadalupe</u> primarily called upon the Court to determine whether the plaintiffs were in fact "ministers" such that the defendant institution was entitled to the exception.  <u>See</u> 565 U.S. at 181, 196 (explaining the Sixth Circuit's holding that the elementary school teacher was not a minister before later reversing that judgment); 591 U.S. at 756 (holding that the teacher was a minister because she performed "vital religious duties").  There is no dispute that plaintiff here is a minister, which was the primary issue in <u>Hosanna-Tabor</u> and <u>Our Lady of Guadalupe</u>.

said about his termination -- which is far from contesting the termination itself. Notwithstanding the fact that this case is related to plaintiff's employment given the parties' prior relationship, it is not an employment discrimination case.

Defendants have conflated the issues in this case, making it appear as though this defamation case is the same as an employment discrimination case. But assessing the legality of what a religious institution says about an adverse employment action is not the same thing as determining the lawfulness of the adverse action itself. The latter necessarily requires a court to interfere with a religious institution's internal management, its doctrinal specificities, and its decisions regarding who preaches the faith, but the former does not. See, e.g., Hayden v. Schulte, 701 So. 2d 1354, 1356 (La. Ct. App. 1997) (holding that a priest's allegations that church officials defamed him by accusing him of child molestation could be litigated because child molestation "cannot be considered just an internal matter of Church discipline or administration").

Indeed, the foundation of the Court's holdings in Hosanna-Tabor and Our Lady of Guadalupe is that a religious entity "must be free to choose who will guide it on its way" and carry out its mission. Hosanna-Tabor, 565 U.S. at 196; see also id. at 196-97 (Thomas, J., concurring) ("[T]he Religion Clauses guarantee religious organizations autonomy in matters of internal governance,

8

including the selection of those who will minister the faith."); Our Lady of Guadalupe, 591 U.S. at 767 (Sotomayor, J., dissenting) ("[T]he First Amendment categorically bars certain antidiscrimination suits by religious leaders against their religious employers.").

Nothing about a defamation suit involves telling a religious institution who it can or cannot fire and for what reasons. A defamation claim has three elements: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585 (2009) (quoting DeAngelis v. Hill, 180 N.J. 1, 13 (2004)). The matter before us requires a factfinder to apply those three elements to the facts presented. Under those facts, defendants' decision to terminate plaintiff is not at issue; their statements afterwards are. Those factual determinations are incomparable to intruding on a religious institution's internal management by interfering with faith-based employment or property management decisions. As such, this case does not inherently require a secular court to interfere "in matters of faith and doctrine and in closely linked matters of internal government." Our Lady of Guadalupe, 591 U.S. at 747. Rather, it involves the veracity of defendants' published statement and the statement's potential for reputational damage to plaintiff.

9

Importing wholesale the principles of the ministerial exception as defined by the Supreme Court in employment discrimination cases, a context inherently intertwined with the selection of a religious entity's ministers, into the tort law context simply on the basis of the employment relationship and the employer's status as a religious entity comes dangerously close to granting religious institutions blanket immunity on tort claims made by ministers, despite the fact that tort claims rely on neutral, generally applicable laws and are often wholly unrelated to the religious institutions' right to govern who guides their faithful.  See, e.g., Petruska v. Gannon Univ., 462 F.3d 294, 299, 310 (3d Cir. 2006) (explaining that the ministerial exception did not bar a minister's fraudulent misrepresentation claim against a religious institution because the claim depended on the truth or falsity of what the institution had promised the plaintiff and "the state's prohibition against fraud [did] not infringe upon [the institution's] freedom to select its ministers").

I would hold that the ministerial exception does not automatically foreclose plaintiff's defamation claim, and I would allow him to proceed with limited discovery to determine if his claim is justiciable under McKelvey.

## II.

Plaintiff here seeks one thing -- discovery, the tool used in every matter in our judicial system, civil or criminal, to ensure that both sides of a dispute

10

have access to the relevant information and evidence.  Discovery sheds light on what happened, and the ability to access information through discovery is essential for a defamation plaintiff.  In this case, obtaining limited information through discovery would assist a trial court in determining under <u>McKelvey</u> "whether adjudication would require the court to choose between competing religious visions, or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers."  173 N.J. at 51 (internal quotation marks omitted).

Defendants contend that their sole allegedly defamatory statement -- that plaintiff's conduct was "neither acceptable nor consistent with how a rebbe in our Yeshiva should interact with students" -- explains the reasons they terminated plaintiff.

Defendants assert that, because truth is an absolute defense to defamation, adjudicating the merits of plaintiff's claim would necessarily require a factfinder to inquire into the validity of the reasons they proffered for terminating plaintiff, which is an inherently nonjusticiable religious inquiry.  Not necessarily so.  Once again, defendants conflate the issues.  There is a difference between allowing discovery to determine whether the alleged conduct occurred at all and to uncover the underlying facts supporting the allegations, and discovery to determine whether the adverse action taken as a

11

result of the alleged conduct was justified under Jewish law. Plaintiffs simply seek to understand in the first instance whether the alleged conduct occurred and the facts surrounding the allegations against him. As we said in McKelvey, the church autonomy doctrine "clearly cannot be applied blindly to all disputes involving church conduct or decisions." 173 N.J. at 44.

In this case, as defendants explained in their letter to the public, they retained a law firm to conduct an independent investigation into Rabbi Hyman's conduct. There is no suggestion that the firm interviewed rabbinic authorities or asked them about their analysis of the Rabbi's conduct under Jewish law. At oral argument, defense counsel conceded that the law firm's investigation was as to the underlying facts and did not involve Jewish law. The report should therefore be disclosed to plaintiff. Its factual contents would enable him to evaluate his defamation claim. And its release would not interfere with the Yeshiva's right to select its religious teachers or otherwise offend the principles of the ministerial exception. If plaintiff later sought additional information based on the contents of the report, the trial court could require him to demonstrate that the requested discovery would not run afoul of the ministerial exception.

To be clear, I am not of the belief that every tort matter against a religious entity should proceed. In this matter, after discovery, it may well be

12

that McKelvey bars plaintiff's claim because discovery would illustrate that "adjudication [of the defamation claim] would require the court to choose between competing religious visions." 173 N.J. at 51. Or if it becomes clear after discovery that there is no evidence supporting the allegation that the statement is false, defendants would be entitled to summary judgment. Plaintiff admitted as much at oral argument by conceding that discovery might disprove his cause of action. But a court cannot make that determination until the relevant facts are revealed to it through discovery. See Minker v. Balt. Ann. Conf. of United Methodist Church, 894 F.2d 1354, 1360 (D.C. Cir. 1990) (noting, in discussing the viability of a claim, that "[t]he speculative nature of our discussion here demonstrates why it is premature to foreclose appellant's contract claim. Once evidence is offered, [the court] will be in a position to control the case so as to protect against any impermissible entanglements.").

I would allow discovery in this matter under the careful control of the trial court. Denying complaining parties the ability to prosecute their cases by obtaining the very discovery that allows courts to determine the viability of their claims -- under the cloak of a legal principle that the Supreme Court has only ever applied to employment discrimination cases -- denies litigants with potentially viable claims that do not implicate First Amendment concerns the ability to fully prosecute their cases.

13

A hypothetical discussed during oral argument underscores the importance of discovery here and the dangers of blindly applying the ministerial exception by simply taking a religious entity at its word regarding the proffered reason provided in a statement for terminating an employee. In that hypothetical, a religious institution terminates an employee for a legitimate reason but, because of its dislike of the employee, releases a false statement labeling the employee a pedophile and indicating that was the reason for the termination. Defense counsel argued that even in such a clear case of defamation, no discovery should be allowed for fear of intruding upon the religious institution's autonomy in employment decisions.

In that situation, the fact that the religious institution lied about the employee would never see the light of day under the concurring opinion's analysis because the ministerial exception would deny even the slightest inquiry into the viability of the defamation claim. But if discovery were allowed, depending on the information and communications uncovered, it could become clear that adjudicating the defamation claim would not require a court to analyze whether the religious institution correctly administered its doctrine to effectuate the firing.

The concurring opinion sanctions this troubling result. In my view, allowing religious institutions to use the ministerial exception as both a sword

14

and a shield is not what the courts that created the exception envisioned in ensuring that secular courts did not intrude upon the First Amendment's protections for faith-based internal management decisions.  See Our Lady of Guadalupe, 591 U.S. at 768 (Sotomayor, J., dissenting) (explaining that the appellate courts that adopted the ministerial exception prior to Hosanna-Tabor "had long understood that the exception's stark departure from antidiscrimination law is narrow" and "treaded 'case-by-case'" because of the "exception's 'potential for abuse.'"  (quoting Scharon v. Saint Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 n.3 (8th Cir. 1991))).  Unfortunately, in not allowing even limited discovery in this matter, the concurrence transforms the ministerial exception into a tool that religious entities may use to insulate themselves not only from being subjected to suit, but even from providing basic discovery to determine whether a suit is viable.  Religious entities now have a blueprint for what to say in any public statement in order to not only bar a defamation claim by invoking the ministerial exception, but also to bar discovery.

The ministerial exception, when it applies, is "extraordinarily potent," giving employers "free rein to discriminate" for any reason in the employment context, "whether religious or nonreligious, benign or bigoted, without legal recourse."  Id. at 766-67.  Today, the concurring opinion regrettably extends

15

that powerful "exception" to virtually all tort claims against a religious employer if they are brought by a current or former employee, despite the fact that most tort claims do not and will not implicate the First Amendment concerns underpinning the exception. Because I disagree with such a result, I respectfully dissent.[2]

---

[2] I do, however, join in section III.C. of the concurring opinion regarding the McKelvey standard and agree that this Court should not adopt the Appellate Division's standard that "would require only a finding that the former employee was a minister and that the claim is 'related to a religious institution's employment decision.'" Ante at ___ (slip op. at 32).

16